2007 UT 58

**Michael P. O'CONNOR, Plaintiff and Appellant,**

**v.**

**Gary W. BURNINGHAM, Jeanna Burningham, Sandy Phillips, Ruby Ray, Drew Downs, Curt Parke, Julie Parke, Mike Powell, Barbara Powell, Steve Davis, Jan Davis, Todd Kirkpatrick, Sue Chandler, Dallie Haderlie, Wendy Haderlie, John C. Rogers, Kenny Norris, Robyn Norris, Will Sunderland, Darlene Durrant, Robert T. Price, Kim M. Price, Kent Beckstead, Suzanne Beckstead, Lisa Gray, Jessica Johnsen, Jeff Burningham, Sheldon Worthington, Blair Swenson, Paula Swenson, John Jex, and John Does 1–50, Defendants and Appellees.**

**No. 20060090.**

Supreme Court of Utah.

July 31, 2007.

Joseph C. Rust, Matthew G. Bagley, Salt Lake City, for plaintiff.

Harold L. Peterson, Salt Lake City, for defendants Gary and Jeanna Burningham.

Michael W. Homer, Jesse C. Trentadue, John D. Luthy, Salt Lake City, for all other defendants.

Michael T. McCoy, Clover Meaders, Murray, for amicus Utah Education Ass'n.

NEHRING, Justice:

¶ 1 More than forty years have passed since the United States Supreme Court placed public officials on notice that they could seek redress for defamatory statements made about them only if actual malice animated those statements. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (involving a Montgomery, Alabama commissioner whose duties included the supervision of the police department). What the Court did not announce at the time, however, was the full roster of public officials, leaving considerable uncertainty over who qualified as a public official and who did not. *Cf. Rosenblatt v. Baer*, 383 U.S. 75, 85, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966) (indicating *New York Times* did not determine the " 'categories of persons who would or would not be included' " (quoting 376 U.S. at 284 n. 23, 84 S.Ct. 710)).

¶ 2 Today we hold that a women's high school basketball coach is not a public official and that, therefore, defamatory remarks made about such a coach are not entitled to heightened constitutional protection. We further hold that the defendants, who made statements that the coach contends are defamatory, enjoy a conditional privilege. We therefore reverse the district court's grant of summary judgment in favor of the defendants and remand this case for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 3 Michael O'Connor was the women's basketball coach at Lehi High School, located in a small, northern Utah town. In the fall of 2003, Michelle Harrison enrolled at the high school. From all accounts Ms. Harrison possessed basketball talent that placed her among the elite of high school basketball players nationwide.[1] Her arrival, however, did not herald the beginning of a basketball dynasty at the school, nor did the considerable basketball skill disparity between Ms. Harrison and her Lehi teammates foster a desirable team chemistry. Whatever the causes may have been, that all was not well in the Lehi Pioneers' locker room soon became evident and, this spelled trouble for Mr. O'Connor.

¶ 4 Commencing in November 2003 and continuing until the school dismissed Mr. O'Connor as the women's basketball coach before the start of the 2004–2005 school year, certain parents, extended family members, and friends of basketball team members (whom we will collectively refer to as the Parents as that is the term the parties chose for their own briefing) undertook a persistent and multifaceted campaign of complaints against Mr. O'Connor. They criticized his coaching demeanor. They questioned his use of money allocated to the team for travel and other team expenses. They accused him of

---

1. Ms. Harrison, who left Lehi High School after Mr. O'Connor's dismissal as the women's basketball coach, was named Utah's Division 3A Most Valuable Player in 2006 and competed as a member of Stanford University basketball team during the 2006–2007 season.

extending unfair preferential treatment to Ms. Harrison both on and off the basketball court. They claimed that he had improperly recruited a player from another school.

¶ 5 Mr. O'Connor's detractors took their grievances to the school principal and administrators. Dissatisfied with the school administration's determination that Mr. O'Connor had done nothing wrong and put off by the principal's letter setting out ground rules for complaining about the coach, the Parents directed their complaints to a new audience: the Alpine School Board. Although the school board took no formal action against him, the high school administration dismissed Mr. O'Connor from his role as the women's basketball coach and cited as grounds for its decision his refusal to promise that he would not deny team membership and playing time to the women in retaliation against the Parents.

¶ 6 Mr. O'Connor sued the Parents for defamation. The Parents successfully moved for summary judgment before the district court based on their contention that Mr. O'Connor was a public official and, consequently, could not proffer a case for defamation without demonstrating that the Parents made their statements with actual malice-a showing the record did not permit. Mr. O'Connor appealed.

## ANALYSIS

### I. MR. O'CONNOR AS A WOMEN'S HIGH SCHOOL BASKETBALL COACH IS NOT A PUBLIC OFFICIAL

¶ 7 The central question before us—whether Mr. O'Connor is a public official—is an inquiry mandated by federal First Amendment principles announced by the United States Supreme Court. *See, e.g., Monitor Patriot Co. v. Roy,* 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971); *Ocala Star–Banner Co. v. Damron,* 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971); *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

¶ 8 A central maxim of these cases is that in the realm of defamation law all persons are not treated equally. Those who by choice or mishap acquire the status of a public official or public figure surrender a sizeable measure of their right to recover damages from those who defame them. Statements directed against public officials or public figures require proof that the speaker acted with actual malice and is thus more at "fault" than one whose defamatory statements were the product of a less malignant state of mind. *See, e.g., N.Y. Times,* 376 U.S. at 279, 84 S.Ct. 710 ("[C]onstitutional guarantees require ... prohibit[ing] a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."). The heightened burdens placed on public officials and public figures by the First Amendment define the limits of recovery under state defamation laws.

¶ 9 The Supreme Court justified its decision to disqualify public officials from recovering for defamatory statements that would be actionable if made against private citizens by recalling our nation's unfortunate experience with attempts to muzzle speech critical of office holders. As the Supreme Court saw matters, to permit civil money damage awards against a public official was to tolerate a practice too reminiscent of the sanctions on expression imposed by the odious Sedition Act, ch. 74, 1 Stat. 596 (1798). *See generally N.Y. Times,* 376 U.S. at 296, 84 S.Ct. 710 (Black, J., concurring) ("[Congress] did pass the Sedition Act in 1798, which made it a crime—"seditious libel"—to criticize federal officials or the Federal Government.... [T]hat Act came to an ignominious end and by common consent has generally been treated as having been a wholly unjustifiable and much to be regretted violation of the First Amendment."). The lessons provided by the Sedition Act and other attempts by those entrusted with power to silence their critics were not lost on the Supreme

Court. *See, e.g., id.* at 297, 84 S.Ct. 710 (Black, J., concurring) ("I doubt that a country can live in freedom where its people can be made to suffer physically or financially for criticizing their government, its actions, or its officials. 'For a representative democracy ceases to exist the moment that the public functionaries are by any means absolved from their responsibility to their constituents; and this happens whenever the constituent can be restrained in any manner from speaking, writing, or publishing his opinions upon any public measure, or upon the conduct of those who may advise or execute it.'" (quoting Sir George Tucker, Blackstone's Commentaries *297 (1803))).

¶ 10 This court has applied the public official principle, albeit clumsily as we shall discuss shortly, in deciding defamation cases in which the defendants sought refuge in the First Amendment. We have not adopted the public official rubric as an interpretive guidepost to the Utah Constitution, but have instead elected to embrace the Supreme Court's defamation jurisprudence as our own. *See generally West v. Thomson Newspapers,* 872 P.2d 999, 1008 n. 13 (Utah 1994) ("Utah's 'fault' requirement ... is derived from First Amendment standards."); *Seegmiller v. KSL, Inc.,* 626 P.2d 968, 971–72 (Utah 1981) (grounding public official and public figure analysis in federal First Amendment jurisprudence).

¶ 11 The Supreme Court's recognition of the "public official" concept in *New York Times* appeared in the first of a brisk series of pronouncements on the proper relationship between the First Amendment and the right to protect reputation from defamatory assaults. It was followed in short order by *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), *Baer* in 1966, and *Butts* in 1967. *New York Times* shielded those who directed comments at public speakers from liability for all expression except for that made with actual malice, or with either knowledge of or reckless disregard for the statement's falsity. 376 U.S. at 280, 84 S.Ct. 710. The Court was less clear, however, in setting out just who a public official might be, noting that the case did not occasion them "to determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included." *Id.* at 284 n. 23, 84 S.Ct. 710. A comprehensive definition of public official continues to escape courts, and this open question is precisely the one that we are called upon to answer here.

¶ 12 The Court first attempted to fill the gap in *Baer* by providing functional guidance that a public official exists for the purposes of *New York Times* "[w]here a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." *Baer,* 383 U.S. at 86, 86 S.Ct. 669. Both the Parents and Mr. O'Connor claim victory under a proper application of this guideline. For reasons to which we now turn our attention, we refuse to classify Mr. O'Connor's position as one endowed with "apparent importance" and therefore decline to extend public official status to a high school basketball coach.

¶ 13 Decided in the term immediately following *Baer, Butts* created a constitutional public figure category to complement the public official category. 388 U.S. at 155, 87 S.Ct. 1975. While both public figures and public officials surrender the same degree of protection to their reputations in the interest of unfettered public expression, they remain separate legal categories. *Cf. id.* at 164, 87 S.Ct. 1975 (Warren, C.J., concurring) ("It is plain that although they are not subject to the restraints of the political process, 'public figures,' like 'public officials,' often play an influential role in ordering society. And surely as a class these 'public figures' have as ready access as 'public officials' to mass media of communication; both to influence policy and to counter criticism of their views and activities."). Had the Supreme Court deemed Wally Butts, the defamed plaintiff and University of Georgia athletic director, a public official, we would have been more sympathetic to the Parents' contention that the Lehi High School women's basketball coach should qualify as well. Although Mr.

Butts was not technically a state employee, the Court nevertheless balked at finding that he, as the athletic director of a major public university, fell within the grasp of the public official standard even in the face of arguments that "the public interest in education in general, and in the conduct of the athletic affairs of educational institutions in particular, justifies constitutional protection." *Id.* at 146, 87 S.Ct. 1975; *see also id.* at 154, 87 S.Ct. 1975 (explaining that because Mr. Butts did not have "any position in government which would permit a recovery by him to be viewed as a vindication of governmental policy," his case could not "be analogized to prosecutions for seditious libel" and "none of the particular considerations involved in *New York Times* [was] present"). The Parents advance a similar argument in this case, which gives us pause.

¶ 14 Chief Justice Warren's concurring opinion in *Butts* explains to our satisfaction why the athletic director of a major state university, an individual who occupied a position of prominence immeasurably greater than a high school basketball coach, would not qualify as a public official even had the technicality that made Mr. Butts a private employee not intervened. To the Chief Justice, expansion of the *New York Times* protections was justified, even mandated, by the increasing delegation to private entities of functions traditionally and exclusively within the province of government. On this point, he observed that, in our increasingly complex society, "policy determinations which traditionally were channeled through formal political institutions are now originated and implemented through a complex array of boards, committees, commissions, corporations, and associations, some only loosely connected with the Government." *Id.* at 163, 87 S.Ct. 1975 (Warren, C.J., concurring). With regard to individuals, he noted that "[t]his blending of positions and power has also occurred ... so that many who do not hold public office ... are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Id.* at 163–64, 87 S.Ct. 1975.

¶ 15 A high school basketball coach—indeed any high school athletic coach—does not ply his trade in a realm occupied by the same public and private actors whose labors caught Chief Justice Warren's attention. We view the constitutional standard for public official announced by the Supreme Court to be limited to those persons whose scope of responsibilities are likely to influence matters of public policy in the civil, as distinguished from the cultural, educational, or sports realms. The "apparent importance" of a position in government sufficient to propel a government employee into a public official status has nothing to do with the breadth or depth of the passion or degree of interest that the government official might ignite in a segment of the public. Nor is celebrity, for good or ill, of the government employee particularly relevant. Rather, it is the nature of the governmental responsibility that guides our public official inquiry. The public official roster is comprised exclusively of individuals in whom the authority to make policy affecting life, liberty, or property has been vested. Likewise, only those issues that have such bearing on civil life as to fairly touch on matters that in the eyes of the law concern life, liberty, or property may be traced to the actions of a public official. So viewed, high school athletics can claim no "apparent importance." The policies and actions of the coach of any high school athletic team does not affect in any material way the civic affairs of a community—the affairs most citizens would understand to be the real work of government.

¶ 16 This is not to say that high school athletics is of no importance to any sphere of human activity. High school coaches can be significant figures in a student's life. A coach's skill, or absence of it, can profoundly shape the future and fortune of a young person. Moreover, because parents are often witnesses to the athletic performances of their children, in contrast to the relative anonymity in which students display their academic feats of skill, parents experience directly the joys, sorrows, and injustices of athletic competition. One would not expect the vitriol directed at Mr. O'Connor to be targeted at the faculty advisor to the Latin club.

¶ 17 Evidence of the expanding media presence and public allure of high school athletics is impossible to avoid. *USA Today* publishes national rankings of players, coaches, and teams in virtually every high school sport offering. *Sports Illustrated* recently added several pages of high school coverage to its weekly menu of sports reporting. These examples and countless others provide ample cause to conclude that high school athletics has claimed an ever-more prominent position in the arena of entertainment and popular culture. These examples do not, however, advance the case for treating coaches as public officials. To be sure, many public officials populate the public education arena. But these employees occupy supervisory and policy-making positions more comprehensive than the role of a coach or teacher. When these educational officials assumed their duties, they likely surrendered no small portion of their ability to protect their reputations. Coaches and teachers struck no such bargain.

¶ 18 The Parents point to this court's opinion in *Madsen v. United Television, Inc.*, 797 P.2d 1083 (Utah 1990), in aid of their contention that the attention Ms. Harrison's presence on the team attracted was itself sufficient to launch Mr. O'Connor into the status of a public official—even if he was able to enjoy the status of a private person during the years he coached Lehi's teams comprised of lesser mortals. Unfortunately, *Madsen* is the source of more confusion than enlightenment on the subject of who qualifies as a public official.

¶ 19 Mr. Madsen was a police officer who killed a man while in the line of duty. He sued the owner of a television station, claiming that its coverage of the shooting defamed him. The trial court concluded that the station was entitled to a qualified privilege based on Officer Madsen's "public" status, and we affirmed. We did not exercise particular care in identifying what kind of "public" man Officer Madsen was, and when all was said and done, we conferred the "public official" designation on him. We reached our conclusion, however, by evaluating Officer Madsen's status using the standards for a public figure. In fact, we unhelpfully conflated public officials and public figures and treated the two concepts as if no difference existed between them in the eyes of the First Amendment. *Id.* at 1084. We did so despite the clear injunction to the contrary by the United States Supreme Court in *Baer* that to be treated as a public official "[t]he employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." 383 U.S. at 86 n. 13, 86 S.Ct. 669.

¶ 20 When presented with the opportunity in subsequent cases, we have attempted to correct the analytical errors made in *Madsen*. For example, in *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896 (Utah 1992), we sought to provide guidance to the bench and bar by offering observations concerning the distinction between public and private figures. *Id.* at 903 n. 20. Among our observations was the recognition that *Madsen* may have been in error when it implied that a person who would not otherwise qualify for public official status may nevertheless acquire it based on events that occurred while performing his duties. This was indeed the implication of *Madsen* where we declined to hold that all police officers were public officials, but determined that a police officer who was involved in a line of duty shooting could, and did, become a public official. This proposition is wrong. Public officials owe their status to the duties demanded by their official positions, not to the vagaries of events that may occur while they occupy these positions. Unlike the status of public figure, the law does not recognize subclassifications of "general purpose public official" or "limited purpose public official." *Id.* Either one is a public official or one is not. The Parents' decision to rely on *Madsen*, though understandable, was ill-advised.

¶ 21 *Madsen's* continued presence in our defamation canon might also explain why the district court used the language of public official and public figure interchangeably. The district court's reasoning appeared to focus on Mr. O'Connor's status as a public official, however. This emphasis on public official carried over to the parties' briefing of

this appeal. Although the parties have included references to the concept of public figure in their briefs, the only analysis is directed at Mr. O'Connor as a public official. We have therefore restricted our discussion to that topic as well. To avoid further misunderstanding concerning the circumstances under which a person may acquire the status of a public official, we overrule *Madsen* insofar as it purports to provide guidance on this question.

## II. WE DECLINE TO DETERMINE WHETHER THE PARENTS' STATEMENTS ARE SUSCEPTIBLE TO DEFAMATORY MEANING

¶ 22 The Parents invite us to affirm the district court's grant of summary judgment on the alternative grounds that none of their statements is susceptible to a defamatory interpretation and that, even if a statement might yield a defamatory interpretation, one or more privileges shielded the statement due to the setting in which it was communicated. Because the district court relied on neither of these alternative grounds in reaching its conclusion that the Parents were entitled to summary judgment, Mr. O'Connor urges us to decline this invitation.

¶ 23 Although the district court did not analyze in its memorandum decision whether the statements were susceptible to a defamatory interpretation or whether they were privileged, the court was clearly aware of both questions, noting that they presented "key questions" of law that "must be answered by the [c]ourt before a case may be submitted to the jury." Our authority to affirm a district court's judgment on grounds other than those relied on by that court derives from a "long-standing rule." *Cox v. Hatch,* 761 P.2d 556, 561 (Utah 1988); *see also West v. Thomson Newspapers,* 872 P.2d 999, 1013 n. 22 (Utah 1994); *Higgins v. Salt Lake County,* 855 P.2d 231, 241 (Utah 1993); *cf. Coulter & Smith, Ltd. v. Russell,* 966 P.2d 852, 856 n. 1 (Utah 1998). While we possess the authority to review the matters constituting the alternative grounds for affirmance urged by the Parents, we are not obligated to exercise this authority. In this instance, we decline to take up the merits of the Parents' claim that Mr. O'Connor failed to establish that their comments were subject to defama-

tory interpretation. This decision is a prudential one.

¶ 24 Inasmuch as we decline to become the first court in the litigation to determine whether the defendants' statements are susceptible to defamatory meaning, we find it prudent to explain how the district court should approach this issue in the event that the question is presented for summary determination after remand. Our past experience reviewing claims of defamatory meaning brought to us on appeal from a grant of summary judgment suggests that we use an analytical approach different from the traditional approach to judging the merits of summary judgment. Although we realize that in general the standard protocols for reviewing summary judgment apply to defamation cases, *see West,* 872 P.2d at 1003–04, the presence of the First Amendment demands a subtle although significant variation in the treatment of inferences drawn from undisputed facts. An examination of *West* will illustrate this distinction.

¶ 25 In *West,* we reversed a court of appeals' determination that three newspaper editorial columns, containing accusations that the mayor of La Verkin, Utah, was, among other things, "manipulating the press," were incapable of sustaining a defamatory meaning. *Id.* at 1000. When it reviewed the district court's grant of summary judgment in favor of the alleged defamers, the court of appeals looked to dictionary definitions of "manipulate," located one featuring negative connotations, and ruled that use of the word was therefore susceptible to defamatory interpretation. *Id.* at 1008. The court of appeals' approach was a wholly defensible application of the summary judgment review principle that a court must construe against the party seeking summary judgment inferences reasonably emanating from the factual record. "Manipulate" has several decided meanings, at least one of which is unflattering and susceptible to a defamatory interpretation. It is entirely understandable that the court of appeals would conclude that the question of whether the newspapers' accusations constituted defamation should be left to the trier of fact. We nevertheless disagreed.

¶ 26 We said that the court of appeals' "approach effectively eviscerate[d] the court's responsibility to determine initially if

the statement is defamatory as a matter of law." *Id.* at 1009 n. 15. Because the existence of defamatory content is a matter of law, a reviewing court can, and must, conduct a context-driven assessment of the alleged defamatory statement and reach an independent conclusion about the statement's susceptibility to a defamatory interpretation. This is not to say that the responsibility of determining whether a statement *is* defamatory as a matter of law falls to the reviewing court. In the first instance, it does not. Rather, the reviewing court must answer the question of defamatory *susceptibility* as a matter of law in a nondeferential manner.

¶ 27 This task leaves no room for indulging inferences in favor of the nonmoving party in the district court. It must weigh competing definitions and make sense of context. Admittedly, a court typically avoids these activities when evaluating a motion for summary judgment. Defamation merits a departure from the standard treatment, however, primarily because it never arrives at court without its companion and antagonist, the First Amendment, in tow. *See, e.g., Jensen v. Sawyers*, 2005 UT 81, ¶ 50, 130 P.3d 325 ("Defamation claims always reside in the shadow of the First Amendment.... In reaching an accommodation consistent with freedom of speech, defamation has accumulated a considerable assortment of defenses, privileges, heightened burdens of proof, and particularized standards of review."). To accommodate the respect we accord its protections of speech, the First Amendment's presence merits altering our customary rules of review by denying a nonmoving party the benefit of a favorable interpretation of factual inferences. *Cf. Roth v. United States*, 354 U.S. 476, 497–98, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (Harlan, J., dissenting).

III. ALTHOUGH THE PARENTS' STATEMENTS ARE INELIGIBLE FOR THE PROTECTION OF THE ABSOLUTE JUDICIAL PROCEEDING PRIVILEGE, THEY ARE PROTECTED BY A CONDITIONAL PRIVILEGE

*A. Application of the Absolute Judicial Proceeding Privilege*

¶ 28 The Parents have also invited us to affirm the district court on the alternative ground that their statements were not actionable because they were protected by either an absolute or conditional privilege. We consider here whether the Parents' statements qualify for protection under an absolute or conditional privilege and will consider each privilege claim in turn.

██ ¶ 29 When circumstances mandate wholly open, frank, and unchilled communication, the law readjusts the scales that balance the right to free expression with the interest in protecting one's reputation. *See, e.g., De-Bry v. Godbe*, 1999 UT 111, ¶ 10, 992 P.2d 979. The scales tip most heavily in favor of unfettered expression when we confer an absolute privilege on the speaker. We extend absolute privileges "to persons whose special position or status requires that they be as free as possible from fear that their actions in their position might subject them to legal action." *Allen v. Ortez*, 802 P.2d 1307, 1311 (Utah 1990). Participants in judicial proceedings are among those who qualify for such a privilege against defamation. *Id.*

██ ¶ 30 The Parents claim absolute sanctuary within this privilege. It is specifically bestowed upon those who make statements "during or in the course of a judicial proceeding" and exists for the purpose of preserving both the integrity of the judicial proceeding and the associated quest for the ascertainment of truth that lies at its heart. *Id.* It is not inimical to this objective that speakers may express false statements, even those uttered with ill motives, within judicial proceedings free of the risk that tort will hold them to account. The system achieves a satisfactory measure of confidence that the search for truth has been fruitful when all who claim to possess part of or the entire truth may freely disclose the basis of that claim.

██ ¶ 31 The judicial proceeding privilege has three elements. First, the alleged defamatory statement must have been made during or in the course of a judicial proceeding. Second, the statement must have some reference to the proceeding's subject matter.

Third, the party claiming the privilege must have been acting in the capacity of a judge, juror, witness, litigant, or counsel in the proceeding at the time of the alleged defamation. *Id.* at 1313; *see also Pratt v. Nelson,* 2007 UT 41, ¶¶ 27–31, 164 P.3d 366 (applying the judicial proceeding privilege in the context of a complaint); *Riddle v. Perry,* 2002 UT 10, ¶ 13, 40 P.3d 1128 (discussing the privilege, its elements, and its furthered public policies as akin to that of the legislative proceeding privilege); *Krouse v. Bower,* 2001 UT 28, ¶ 8, 20 P.3d 895 (applying the privilege in the context of a published demand letter); *Allen,* 802 P.2d at 1311–13 (reviewing the history to date of Utah jurisprudence surrounding the privilege). The statements attributed to the Parents fail on all counts.

¶ 32 Our view of the forums and events that are entitled to designation as judicial proceedings is an expansive one. *Pratt,* 2007 UT 41, ¶ 29, 164 P.3d 366; *see also DeBry,* 1999 UT 111, ¶ 14, 992 P.2d 979 ("[T]he requirement that the defamatory statement must be made in the course of a judicial proceeding requires a broad interpretation of the term 'judicial proceeding.' "). Even under the broadest definition of the term, however, the Parents give us scant reason to deem remarks made by several of their number during the "Community Comment" portion of an Alpine School District Board meeting as falling within any quasi-judicial function of the school board. Although the school board may have the authority to conduct quasi-judicial proceedings under certain circumstances, the record here makes clear that no such proceeding was underway or even contemplated when the statements were made. In the absence of a pending proceeding, the Parents' statements could not possibly satisfy the privilege's second element: that the content of the statements related to the subject matter of the proceeding.

¶ 33 A comparison of the Parents' appearance at the school board meeting with the facts in *Allen* is instructive. In *Allen,* we reversed a grant of summary judgment in favor of a clinical social worker who had sent letters to a mayor and a domestic-relations commissioner, alleging that a child's mother

and stepfather had sexually molested the child. 802 P.2d at 1308. The mother had previously filed a petition to modify her custody and visitation rights. Believing the child to have been abused, the child's father solicited the letters detailing the social worker's affirming conclusions. We held that the social worker was ineligible for the privilege because she failed to satisfy its third element: when she made her statements, she was not, as a matter of law, acting as a witness in a judicial proceeding. For purposes of the privilege, a witness must be more than a person with sufficient expertise in or knowledge of a matter to be of some potential benefit. We were troubled that a contrary view would permit individuals, on their own initiative, to "direct libelous communications to a participant or decision maker in a litigation with impunity." *Id.* at 1313. The judicial system, even when broadly defined, "does not demand such license." *Id.* We decline to extend that license to the Parents here. We believe that the objectives of the absolute, judicial proceeding privilege are at odds with permitting unsolicited communication of defamatory statements to an entity that has undertaken no "judicial proceeding." We therefore hold that the absolute privilege is inapplicable to the statements made by the Parents.

### B. The Conditional Privilege for Family Relationships

¶ 34 The Parents also claim a conditional privilege. Like absolute privileges, qualified privileges take numerous forms. The Parents ask us to extend to them conditional protection for communications that contain information relating to intra-family relationships, a privilege Utah has not yet formally recognized. *Cf.* Restatement (Second) of Torts § 597 (1977) (detailing the intra-family relationship privilege).

¶ 35 In *Brehany v. Nordstrom, Inc.,* 812 P.2d 49 (Utah 1991), we awarded our approval to a similar conditional privilege that concerned a business, as distinguished from a familial, relationship. It was a retail-clothing employer that made the defamatory statements in *Brehany* when explaining to its managers and buyers that it had terminated

the plaintiffs for conduct violating the drug policy; we held that these statements were privileged. We grounded our recognition of the conditional privilege on the existence of an employer's legitimate interest in disseminating its intention to enforce its drug policy.

¶ 36 Because we find little justification to deny relationships in the familial setting the same legitimacy we granted in *Brehany* to those in the business world, we take this occasion to incorporate Restatement (Second) of Torts, section 597 into Utah's defamation jurisprudence. Section 597, entitled "Family Relationships," states:

(1) An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that

(a) there is information that affects the well-being of a member of the immediate family of the publisher, and

(b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the well-being of the member of the family.

(2) An occasion makes a publication conditionally privileged when the circumstances induce a correct or reasonable belief that

(a) there is information that affects the well-being of a member of the immediate family of the recipient or of a third person, and

(b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the well-being of the member of the family, and

(c) the recipient has requested the publication of the defamatory matter or is a person to whom its publication is otherwise within generally accepted standards of decent conduct.

Restatement (Second) of Torts § 597.

¶ 37 Although we hold that Mr. O'Connor's position as coach of the Lehi High School women's basketball team was not of such civic importance as to render him a public official, we conclude that the Parents possess a legitimate interest in affairs of the basketball team of such a degree as to demand that we grant their statements the "breathing space" afforded by section 597. It is important to note that our reference to the Parents

in this context is not limited to immediate family members of basketball team members, but also includes statements made by third parties so long as the statements were published "within the generally accepted standards of decent conduct" under the conditional privilege described in section 595 and recognized by this court in *Brehany*. *See* Restatement (Second) of Torts § 595(1)(b); *Brehany*, 812 P.2d at 58. This standard does not shield defamatory statements that abuse the conditional privilege, but it does protect those defendants who are not immediate family members of women on the team. The Parents may have abused and therefore lost this conditional privilege as a refuge if, for example, they knew their statements regarding Mr. O'Connor were false or acted with a reckless disregard as to their falsity, *see* Restatement (Second) of Torts § 600, exceeded the privilege's purpose in making their statements, *see id.* § 603, or made statements to an individual or in a manner not reasonably believed to be necessary for the accomplishment of the privilege's purpose, *see id.* §§ 604, 605, 605A. *See also Hales v. Commercial Bank*, 114 Utah 186, 197 P.2d 910, 913 (1948) (" 'The publisher's lack of belief in the truth of the defamatory matter published, or his lack of reasonable grounds for so believing, while immaterial to the existence of the privileged occasion, is important as constituting an abuse of the occasion which deprives him of the protection which it would otherwise afford.' " (quoting Restatement of Torts § 594 cmt. b (1938))). Although we have not yet had occasion to formally adopt all the potential means to abuse the privilege cited in the Restatement, they all enjoy close ties to common sense and thus appear worthy of our confidence.

¶ 38 Whether a statement is entitled to the protection of a conditional privilege presents a question of law; whether the holder of the privilege lost it due to abuse presents a question of fact. *Wayment v. Clear Channel Broad., Inc.*, 2005 UT 25, ¶ 53, 116 P.3d 271; *Brehany*, 812 P.2d at 58; *Combes v. Montgomery Ward & Co.*, 119 Utah 407, 228 P.2d 272, 274–75 (1951). The district court's ruling did not address this conditional privilege issue and, therefore, did not consid-

er whether Mr. O'Connor sufficiently carried his burden to demonstrate the existence of a genuine factual issue regarding the Parents' abuse of their privilege. Consistent with our authority to affirm a district court on alternative grounds, we could canvass the record and make this determination in the first instance. Instead, we elect to cede this task to the district court as we have ceded the task of ascertaining the susceptibility of the Parents' statements to defamatory meaning.

## CONCLUSION

¶ 39 We hold that Mr. O'Connor, as a women's high school basketball coach, is not a public official for purposes of defamation law, and we therefore reverse the district court's award of summary judgment in favor of the Parents. We decline to address the merits of the Parents' claim that their statements are not subject to defamatory interpretation, but provide guidance as to the proper method for considering such a claim. Although we hold that the allegedly defamatory statements do not qualify for protection under the absolute judicial proceeding privilege, we formally recognize today a conditional privilege for communications relating to familial relationships. We remand to the district court for proceedings consistent with this opinion.

¶ 40 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.