HUDSON, Justice.
Under New York Times Co. v. Sullivan , 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny, defamation plaintiffs who are "public officials" or "public figures" can recover in a defamation action only upon a showing of actual malice. See id. at 283-84, 84 S.Ct. 710 ;
*822 Chafoulias v. Peterson , 668 N.W.2d 642, 648-49 (Minn. 2003). In this case, we must decide whether appellant Nathan McGuire, a public high school basketball head coach, falls into either of those categories. Having reviewed the undisputed facts regarding McGuire's duties as coach and regarding the lack of any controversy concerning his performance before the allegedly defamatory statements were made, we conclude that McGuire is neither a public official nor a public figure. However, because McGuire did not appeal the district court's conclusion that the statements of respondents Joy Szondy, Chelon Danielson, and Cheryl Hewitt fall under a qualified privilege, we nevertheless affirm summary judgment as to those three respondents. Because the district court granted summary judgment to respondent Julie Bowlin solely on the basis of McGuire's status as a public official, we reverse as to McGuire's defamation claim against her and remand for further proceedings on that claim.
FACTS
This case comes before us following the district court's grant of summary judgment against McGuire. Accordingly, we view the evidence in the light most favorable to him. See Expose v. Thad Wilderson & Assocs., P.A. , 889 N.W.2d 279, 284 (Minn. 2016).
From the fall of 2012 to the spring of 2014, McGuire was the head coach of the girls' basketball program for Woodbury High School. In that role, he oversaw five assistant coaches, made strategic decisions, scheduled games and practices, and had general oversight of the program.
While McGuire was coaching at Woodbury, respondents, all of whom were parents of players on the team, expressed concerns about McGuire's conduct, most notably alleging that he swore at practices, touched players in inappropriate ways,[1] and flirted with players. In January 2014, these concerns ultimately culminated in Bowlin, Szondy, and Hewitt meeting with (and Danielson writing a letter to) school administrators to discuss McGuire's conduct. Two days after respondents met with the school administrators, McGuire was placed on administrative leave from his coaching duties. Two months later, in March 2014, the school district decided not to renew McGuire's coaching contract.
Around the same time, Bowlin and Danielson filed maltreatment-of-minor reports against McGuire with the Minnesota Department of Education. Following an investigation, the Department concluded that Bowlin's daughter had not been subjected to maltreatment. Although the record is silent as to Danielson's daughter, no evidence suggests that the Department reached a different conclusion as to her.
Even after McGuire was removed from his coaching position, Bowlin continued to make statements about him. In August 2014, she emailed another parent that, "Last I heard yesterday he was recently put in jail ... I will find out the truth and call the [Department of Education] today and find out." In December she sent that same parent's spouse a photo of a newspaper article titled "Woodbury man sentenced to jail in stolen funds case," accompanied by a text that said "I know we don't talk anymore but this was part of the Woodbury stuff with [McGuire] that was going on. This guy too got busted." It is undisputed that the subject of the article was not McGuire.
In December 2015, McGuire served and filed a complaint alleging respondents had engaged in defamation and a civil conspiracy, and that Bowlin and Danielson had *823 filed false maltreatment-of-minor reports.[2] Following discovery, Szondy, Danielson, and Hewitt moved for summary judgment. They alternatively argued that because (1) McGuire was a public official, (2) McGuire was a public figure, or (3) their statements were made under a qualified privilege, McGuire was required to prove malice and there was no such proof here. The district court granted their motions, dismissing all claims against Szondy and Hewitt, as well as the defamation claim against Danielson. Four months later, Bowlin and Danielson filed new motions for summary judgment, Bowlin as to all claims against her and Danielson as to the remaining false-reporting and civil-conspiracy claims against her. The district court granted the motions reasoning that McGuire was a public official and that there was no evidence that Bowlin or Danielson "knowingly or recklessly" made a false report. The district court did not reach the issue of whether McGuire was a public figure.
In the court of appeals, McGuire appealed the issues of whether he was a public official, whether there was any genuine issue of material fact that respondents acted with actual malice, and whether there was any genuine issue of material fact that Bowlin[3] knowingly or recklessly filed a false maltreatment-of-minor report. In an unpublished opinion, the court of appeals affirmed the district court's decisions. McGuire v. Bowlin , No. A18-0167, 2018 WL 6273533 (Minn. App. Dec. 3, 2018). The court held that McGuire was a public official, that nothing in the record showed that respondents acted with actual malice, and that there was no evidence that Bowlin knowingly or recklessly filed a false maltreatment report. Id. at *4-6.
McGuire petitioned for further review solely on the issue of whether he was a public official for the purpose of his defamation claims. We granted his petition.
ANALYSIS
I.
McGuire appeals the court of appeals' conclusion that he is a public official. Whether McGuire is a public official is a question of law that we review de novo. Britton v. Koep , 470 N.W.2d 518, 520 (Minn. 1991).
To prevail on a defamation claim, a plaintiff must show: (1) that the defendant made a false and defamatory statement about the plaintiff; (2) that the statement was an unprivileged publication to a third party; (3) that the statement had a tendency to harm the plaintiff's reputation in the community; and (4) that the defendant was at fault (at least negligent). Id. This case concerns the standard to be applied in determining fault.
In New York Times Co. v. Sullivan , the Supreme Court held that the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'-that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-80, 84 S.Ct. 710. At that *824 time, the Court noted that it had "no occasion here to determine how far down into the lower ranks of government employees the 'public official' designation would extend ... or otherwise to specify categories of persons who would or would not be included." Id. at 283 n.23, 84 S.Ct. 710. Two years later, the Court elaborated that the higher fault requirement for public officials was based on two motivating forces: "first, a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues." Rosenblatt v. Baer , 383 U.S. 75, 85, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). The Court went on to note, however, that those interests must be balanced against the "pervasive and strong interest" society has in "preventing and redressing attacks upon reputation." Id. at 86, 86 S.Ct. 669.
We most recently had occasion to address the scope of the public-official designation in Britton , 470 N.W.2d 518. In that case, we identified three criteria to use in evaluating whether an individual's position makes them a public official: first, "performing governmental duties directly related to the public interest," second, "holding a position to influence significantly the resolution of public issues," and third, "government employees having, or appearing to the public to have, substantial responsibility for or control over the conduct of government affairs." Id. at 522. We address each criterion in turn.
The first Britton criterion is whether McGuire was performing governmental duties directly related to the public interest. This criterion has its origins in Hirman v. Rogers , 257 N.W.2d 563 (Minn. 1977). There, the plaintiff was a police officer, and the parties and the district court all agreed that he was a public official. Id. at 566. Thus, the plaintiff's public-official status did not receive significant discussion. See id. However, in Britton , we acknowledged that the criterion as articulated in Hirman is "very broad and could be applied to any government functionary." Britton , 470 N.W.2d at 522. Indeed, taken literally, it would extend from the lowest level of government employees all the way to elected officials. Such a scope is contrary to the Supreme Court's public-official jurisprudence, which clearly suggests that the classification ceases to apply at lower levels. See Hutchinson v. Proxmire , 443 U.S. 111, 119 n.8, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) ("The Court has not provided precise boundaries for the category of 'public official'; it cannot be thought to include all public employees, however."). We therefore take this opportunity to make explicit what was implicit in Britton : our inquiry does not end with whether McGuire was performing governmental duties directly related to the public interest; instead, we weigh society's interest in open, public debate about the performance of the duties of a high school basketball coach against society's interest in protecting reputation. See Rosenblatt , 383 U.S. at 86 n.13, 86 S.Ct. 669 (noting the need to balance the interest in discussing the execution of government duties against the interest in protecting reputation); Britton , 470 N.W.2d at 522-23 (considering the duties of the plaintiff to evaluate public-official status).
McGuire identifies his duties as "supervision of strategic team decisions such as team selection, offensive and defensive strategies, scheduling games, and general oversight over the program." Amicus National High School Basketball Coaches Association adds (and no party contests) that head coaches would typically "decide who got court time," "set the tempo of practices," "refrain from playing girls who skipped practice," and "encourage them to *825 try harder, or play better, or to utilize certain tactics or ideas that he had imparted beforehand or on the fly." Finally, the parties dispute McGuire's precise role in hiring assistant coaches. McGuire claims that only the school district has authority to hire coaches. Respondent asserts that McGuire had indeed exercised hiring authority.
On balance, the interest society has in the execution of these duties does not overcome the interest in protecting reputation. As noted above, the actual-malice requirement for public officials arises out of a desire to allow the public to freely debate public issues, as well as the related concern of the qualifications of those with the power to influence the resolution of those issues. Rosenblatt , 383 U.S. at 85, 86 S.Ct. 669. Undoubtedly, the public has some "interest" in the duties McGuire carried out, in the sense that members of the public pay attention to school sports, including the results of a team's games. But in our view this interest is not enough. Just as the public has an interest in how McGuire carries out his duties, McGuire-indeed, society as a whole-has an interest in ensuring the ability to protect his reputation. The public-official designation seeks to strike a balance between "the interests of the community in free circulation of information and those of individuals in seeking recompense for harm done by the circulation of defamatory falsehood." Curtis Publ'g. Co. v. Butts , 388 U.S. 130, 152-53, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (plurality opinion). To strike this balance, we conclude that, for the "government duty" criterion to support the conclusion that someone is a public official, his or her duties must relate to the core functions of government, such as safety and public order. Although McGuire was employed by the school district, his coaching duties are ancillary to core functions of government; put simply, basketball is not fundamental to democracy.
A review of past cases where a plaintiff's public-official status was at issue supports our conclusion. In New York Times , the plaintiff was an elected city commissioner, whose duties included "supervision of the Police Department, Fire Department, Department of Cemetery and Department of Scales." 376 U.S. at 256, 84 S.Ct. 710 (internal quotation marks omitted). In Standke v. B.E. Darby & Sons, Inc. , we held that members of a grand jury, who had the power to "accuse[ ], by way of indictment or presentment, persons implicated in crime," as well as the power "to investigate on its own initiative situations where it has reason to believe a public offense has been committed," were public officials. 291 Minn. 468, 193 N.W.2d 139, 143-44 (1971). Finally, in Britton , the plaintiff was a juvenile probation officer, with the powers "to arrest, detain, investigate, report, and take custody of juveniles." 470 N.W.2d at 523. In all these cases, the plaintiff's duties had the potential to impact a substantial portion of the public at large. McGuire's specific governmental duties do not relate to the core functions of government, nor do they impact a substantial portion of the public at large. Accordingly, society's interest in unencumbered discussion of McGuire's performance does not outweigh the countervailing interest in ensuring defamed individuals can effectively vindicate their reputations.
The second Britton criterion is whether McGuire held a position to influence significantly the resolution of public issues. In determining what constitutes a "public issue," we are guided by the Supreme Court's statement in Rosenblatt regarding the basis for the public official designation-that society has "a strong interest in debate on public issues , and ... a strong interest in debate about those persons who *826 are in a position significantly to influence the resolution of those issues." 383 U.S. at 85, 86 S.Ct. 669 (emphasis added).
The plaintiff in Rosenblatt was the manager of a public ski area, who, by his own admission, was "personally responsible for its financial affairs." Id. at 77, 83, 86 S.Ct. 669. The public issue in Rosenblatt was how the plaintiff went about allocating those public funds, specifically, whether he was properly allocating them in a way that developed the ski area to its full potential as "either a resort for local residents or a tourist attraction that might contribute to the county's taxes." Id. at 77-78, 86 S.Ct. 669.
The putative public issue in this case-the operation of a high school basketball team-is far afield from the public issue in Rosenblatt . We acknowledge that high school basketball is an important piece of the social fabric in many communities. And the wins and losses of a high school basketball team-as well as who plays and who does not-may lead to emotional highs and lows in the lives of the players and their families. Nevertheless, these issues are not the sort of issues that the public has "a strong interest in debat[ing]." Id. at 85, 86 S.Ct. 669. Rosenblatt therefore suggests that McGuire's position is not that of a public official.
Hewitt argues that the public issue in this case is not the basketball team's success, but rather McGuire's specific conduct as coach. In doing so, Hewitt erroneously shifts the focus of the public-official inquiry from McGuire's role to McGuire's conduct. But the Supreme Court was clear in Rosenblatt that a person's status as a public official does not depend on the particulars of the person's conduct; instead, "[t]he employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." Id. at 86 n.13, 86 S.Ct. 669 (emphasis added). Looking solely at McGuire's position, he does not have the ability to influence significantly the resolution of public issues.
The final Britton criterion is whether McGuire had, or appeared to the public to have, substantial responsibility for or control over the conduct of government affairs. 470 N.W.2d at 522. Simply put, McGuire did not. Britton identifies the origins of this criterion as our decision in Standke v. B.E. Darby & Sons . See Britton , 470 N.W.2d at 522. In Standke , the plaintiffs were former grand jurors, who held and exercised "powers which are governmental in nature." 193 N.W.2d at 143. McGuire, in contrast, neither has nor appears to the public to have such powers of a governmental nature. He cannot indict others for crimes, he cannot investigate potential public offenses, and he cannot inquire into the conditions of prisoners or corruption on the part of public officers. See id. at 143-44. What he can do is determine the strategy of a basketball team.
Of course, because this is a public-school basketball team, and public schools are part of government, McGuire was technically engaged in government affairs. But, as with the question of whether McGuire was performing government duties, the mere fact that he received a government paycheck in exchange for the performance of his job is insufficient to satisfy the third Britton criterion. See Hutchinson , 443 U.S. at 119 n.8, 99 S.Ct. 2675 ; Rosenblatt , 383 U.S. at 86 n.13, 86 S.Ct. 669. Instead, we look to the nature of the government affairs over which McGuire has or appears to have control. And, as with the question of whether McGuire was performing governmental duties, we conclude that coaching a high school basketball team is not *827 within the scope of "governmental affairs" as that phrase was used in Standke and Britton .
Analysis of the Britton criteria show that McGuire is not a public official. Nevertheless, relying heavily on Elstrom v. Independent School District No. 270 , 533 N.W.2d 51 (Minn. App. 1995), rev. denied (Minn. July 27, 1995), respondents argue that we should hold that McGuire is a public official. In Elstrom , the court of appeals held that a public-school teacher is a public official. Id. at 54. Elstrom is not binding on our court, and, given the distinct roles teachers and coaches occupy, we have no occasion today to determine whether it was decided correctly.
Finally, we note that the weight of authority in other jurisdictions that have addressed the public-official status of coaches supports our conclusion. Courts of last resort in five other jurisdictions have addressed whether coaches are public officials. Four of those jurisdictions have concluded that they are not. Moss v. Stockard , 580 A.2d 1011, 1029-30 (D.C. 1990) ; Verity v. USA Today , 164 Idaho 832, 436 P.3d 653, 663 (2019) ; Milkovich v. News-Herald , 15 Ohio St.3d 292, 473 N.E.2d 1191, 1195 (1984), overruled by Scott v. News-Herald , 25 Ohio St.3d 243, 496 N.E.2d 699 (1986) ;[4] O'Connor v. Burningham , 165 P.3d 1214, 1219 (Utah 2007) ; Contra Johnston v. Corinthian Television Corp. , 583 P.2d 1101, 1103 (Okla. 1978).
We find the reasoning of O'Connor particularly persuasive. Like McGuire, the plaintiff there was a high school basketball coach. O'Connor , 165 P.3d at 1216. Like McGuire, the plaintiff in O'Connor was the subject of "a persistent and multifaceted campaign of complaints ..." Id. at 1216-17. Concluding that the plaintiff was not a public official, the Utah Supreme Court said:
A high school basketball coach-indeed any high school athletic coach-does not ply his trade in a realm occupied by the same public and private actors whose labors caught Chief Justice Warren's attention.[5] We view the constitutional standard for public official announced by the Supreme Court to be limited to those persons whose scope of responsibilities are likely to influence matters of public policy in the civil, as distinguished from the cultural, educational, or sports realms. The "apparent importance" of a position in government sufficient to propel a government employee into a public official status has nothing to do with the breadth or depth *828 of the passion or degree of interest that the government official might ignite in a segment of the public. Nor is celebrity, for good or ill, of the government employee particularly relevant. Rather, it is the nature of the governmental responsibility that guides our public official inquiry. The public official roster is comprised exclusively of individuals in whom the authority to make policy affecting life, liberty, or property has been vested. Likewise, only those issues that have such bearing on civil life as to fairly touch on matters that in the eyes of the law concern life, liberty, or property may be traced to the actions of a public official. So viewed, high school athletics can claim no "apparent importance." The policies and actions of the coach of any high school athletic team does not affect in any material way the civic affairs of a community-the affairs most citizens would understand to be the real work of government.
Id. at 1219. This reasoning aptly parallels our analysis of the Britton criteria.
In conclusion, we hold that under Britton , McGuire is not a public official. Because he is not a public official, the district court erred when it granted summary judgment on that basis.
II.
Respondents argue that, even if McGuire is not a public official, we should nevertheless affirm summary judgment because McGuire is a limited-purpose public figure, a status that would similarly require McGuire to prove actual malice. See Chafoulias v. Peterson , 668 N.W.2d 642, 648-49 (Minn. 2003). Although neither the district court nor the court of appeals addressed this issue, the issue has been briefed at each stage of the proceedings. Accordingly, in the interests of judicial economy, and because McGuire's status as a limited-purpose public figure is a question of law that requires no deference to the court of appeals or the district court, we address it here. See Doe 76C v. Archdiocese of Saint Paul & Minneapolis , 817 N.W.2d 150, 163 (Minn. 2012) ("[W]e may affirm a grant of summary judgment if it can be sustained on any grounds."); Kafka v. O'Malley , 221 Minn. 490, 22 N.W.2d 845, 849 (1946) ("While a respondent cannot assign error upon appeal, decision in his favor may be predicated upon any ground appearing as a matter of law in the record.").
Following the holding in New York Times that public officials must prove actual malice to prevail on a defamation claim, the Supreme Court applied a heightened standard to defamation claims brought by nongovernment employees in two cases that did not result in majority opinions. See Rosenbloom v. Metromedia, Inc. , 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) ; Curtis Publ'g Co. v. Butts , 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Finally, in 1974, the Court held in Gertz v. Robert Welch, Inc. , that "public figures," like public officials, may recover for injury to reputation only upon a showing of actual malice. 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).
The Court went on to define three types of public figures. First, involuntary public figures are people who become public figures "through no purposeful action of [their] own." Id. at 345, 94 S.Ct. 2997. The Court noted that involuntary public figures are "exceedingly rare." Id. Indeed, no case from the Supreme Court, our court, or the Minnesota Court of Appeals has ever concluded that a plaintiff is an involuntary public figure. Second, all-purpose public figures are people who have attained their status having "assumed roles of especial prominence in the affairs of society ... [with] such persuasive power *829 and influence that they are deemed public figures for all purposes." Id. Finally, limited-purpose public figures are "those classed as public figures [who] have thrust themselves to the forefront of particular controversies in order to influence the resolution of the issues involved." Id. It is this last category that is at issue here.
Applying Gertz , we have held that three factors must be present for someone to be a limited-purpose public figure: "(1) whether a public controversy existed; (2) whether the plaintiff played a meaningful role in the controversy; and (3) whether the allegedly defamatory statement related to the controversy." Chafoulias , 668 N.W.2d at 651 (citing Gertz , 418 U.S. at 352, 94 S.Ct. 2997 ). In determining whether a public controversy existed, we do not look to any controversy created by the allegedly defamatory statements; instead, our inquiry is limited "to those controversies that are already the subject of debate in the public arena at the time of the alleged defamation." Id. at 652.
We are unable to discern any public controversy here. Although controversy ensued after respondents made the allegedly defamatory statements about McGuire, that controversy cannot serve as a basis for concluding that McGuire is a limited-purpose public figure. As Chafoulias makes clear, a party cannot stir up controversy by making defamatory statements and then point to the resulting controversy as a basis for assigning the defamed party public-figure status. See id. at 651-52.
Hewitt seeks to avoid this conclusion by arguing that the controversy in question was "high school sports." We think this assertion paints with too broad a brush. Controversies must be capable of "resolution," see id. at 653 (noting plaintiff must be able to have an impact on the resolution of the controversy), and, although particular facets of high school sports are capable of resolution, the activity as a whole is not. Moreover, even if Hewitt's proposed controversy were narrowed, for example to "whether McGuire was effectively coaching the teams to win as many games as possible," we remain unpersuaded. First, the record does not suggest that a controversy existed concerning this topic. Second, even if a controversy existed, respondents would nevertheless fail on the third public-figure factor-whether the allegedly defamatory statement related to the controversy. The statements at issue were unrelated to whether the team was being coached to win as many games as possible; instead, they related to allegedly inappropriate conduct towards players. Accordingly, we conclude that McGuire is not a limited-purpose public figure for the purpose of evaluating respondents' allegedly defamatory statements.
III.
Hewitt argues that even if McGuire is neither a public official nor a public figure, we should nevertheless affirm summary judgment because the district court also granted summary judgment on the basis that the statements of Hewitt, Szondy, and Danielson are subject to a qualified privilege and McGuire did not appeal that ruling either to the court of appeals or to our court. Failing to raise an issue both before the court of appeals and in a petition for review forfeits the issue. Figgins v. Wilcox , 879 N.W.2d 653, 658 (Minn. 2016). McGuire conceded as much at oral argument, agreeing that because he did not appeal the district court's ruling on the issue of qualified privilege, Hewitt was entitled to summary judgment on that basis. The district court also granted summary judgment to Szondy and Danielson *830 on that basis.[6] Accordingly, we affirm summary judgment concerning Szondy, Danielson, and Hewitt.
CONCLUSION
For the foregoing reasons, we affirm the decision of the court of appeals regarding Szondy, Danielson, and Hewitt, reverse the decision with respect to McGuire's defamation claim against Bowlin, and remand the case to the district court for further proceedings consistent with this opinion.
Affirmed in part, reversed in part, and remanded.

Specifically, McGuire was accused of giving a back rub to a player during an away game and moving players by their shoulders and hips during practices.

The complaint also contained claims against Bowlin's husband. The district court, after giving notice to the parties that it would dismiss the claims against Mr. Bowlin unless McGuire offered evidence suggesting his liability, sua sponte dismissed the claims against him. That dismissal is not challenged on appeal.

Although McGuire initially appealed whether his false-reporting claim against Danielson had been properly dismissed, he did not pursue that argument in his briefing to the court of appeals, and the court did not address it.

Milkovich has since been overruled by the Ohio Supreme Court, but the discussion in that decision suggests that under the newly announced test, the Ohio Supreme Court would still have concluded that coaches are not public officials. See Scott v. News-Herald , 25 Ohio St.3d 243, 496 N.E.2d 699, 702-03 (1986) (noting plaintiff had "substantial responsibilities" for operation of entire school system).

In Curtis Publishing Co. , Chief Justice Warren authored a concurring opinion, which noted that since World War II, "[i]n many situations, policy determinations which traditionally were channeled through formal political institutions are now originated and implemented through a complex array of boards, committees, commissions, corporations, and associations, some only loosely connected with the Government." 388 U.S. at 163, 87 S.Ct. 1975 (Warren, C.J., concurring). Chief Justice Warren went on to express concern that limiting the New York Times actual-malice requirement to public officials would prevent criticism of individuals "who do not hold public office at the moment [but] are nevertheless intimately involved in the resolution of important public questions." Id. at 164, 87 S.Ct. 1975. We agree with the Utah Supreme Court that high school basketball coaches are not within the scope of individuals giving rise to these concerns.

The district court granted summary judgment to Bowlin only on the basis of McGuire's public-official status.