2019 UT App 8

## THE UTAH COURT OF APPEALS

REBECCA DAVIDSON, TARA SMELT, AND TAYO, INC.,
Appellants,
*v.*
CHRIS BAIRD, CONNIE MCMILLAN,
JIM STILES, AND THE CANYON COUNTRY ZEPHYR,
Appellees.

Opinion
No. 20170200-CA
Filed January 10, 2019

Seventh District Court, Moab Department
The Honorable Lyle R. Anderson
No. 160700036

Gregory W. Stevens, Attorney for Appellants

Russell C. Fericks, Barry Scholl, and Kendall
Moriarty, Attorneys for Appellees

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES KATE APPLEBY and DIANA HAGEN concurred.

HARRIS, Judge:

¶1     A free democracy is often messy and, in our country, those willing to serve in public positions and who are entrusted with appropriately spending the public's money must be "[individuals] of fortitude, able to thrive in a hardy climate," and willing to put up with robust, even sharp, criticism of their actions by members of the public whom they represent. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964) (quotation simplified). The First Amendment to the United States Constitution affords a level of protection even for "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270.

¶2    In this case, we are called upon to consider the legality, under state defamation law, of certain comments—made by a citizen, a reporter, and another public official—expressing criticism of actions taken by Rebecca Davidson while she was employed as the City Manager of Moab, Utah. Faced with the choice of suffering her critics' slings and arrows in silence, or taking action against her sea of troubles,[1] Davidson (and two other related plaintiffs) chose the latter course, and filed a lawsuit accusing her critics of defamation and other torts. The district court dismissed the lawsuit on summary judgment, and Plaintiffs appeal. We affirm.

BACKGROUND

¶3    Davidson came to Moab with some experience—and some experience with controversy—in municipal government. Prior to accepting employment in Moab, Davidson worked in the city governments of Kemmerer, Wyoming and Timnath, Colorado. Timnath is a small town, and while the record contains little information about Davidson's duties there, it appears she worked as an "engineer" or as "town manager." Davidson acknowledges that, during her time in Timnath, criticism was leveled against her related to her work, but she characterizes those allegations as "false" and claims that the Timnath Town Council cleared her "of any wrongdoing . . . [and] issued a press release expressing that fact."

¶4    Following her departure from Timnath, Davidson next took a job as the City Administrator of Kemmerer, Wyoming. While working there, Davidson became acquainted with plaintiff

---

1. WILLIAM SHAKESPEARE, *Hamlet*, act III, sc. 1 (inquiring as to "[w]hether 'tis nobler in the mind to suffer the slings and arrows of outrageous fortune, or to take arms against a sea of troubles, and by opposing end them?").

Tara Smelt, who had been hired as Kemmerer's Director of Communications and Events, as well as another individual (Consultant) who had been hired by the city as an IT consultant. Among other things, Smelt's duties included serving as a "channel of communication" with Consultant. While Davidson worked for Kemmerer, a concern apparently arose that the town's IT system was not sufficiently secure and might become a target for foreign hackers, and the town hired Consultant to investigate and address these issues.

¶5 While in Kemmerer, Davidson also became acquainted with defendant Connie McMillan, a Kemmerer resident who came to believe that Davidson was "creating a horrible work environment" for city employees and was thereby causing good employees to leave. McMillan acted on this conviction by repeatedly voicing her concerns at city council meetings, and by organizing like-minded citizens of Kemmerer into vocal public opposition to Davidson.

¶6 In April 2015, Davidson left Kemmerer to take the City Manager position in Moab. Smelt had already relocated to Moab, and Smelt moved into Davidson's house in Moab soon after Davidson arrived. The City of Moab assigned Davidson goals for 2015 and 2016, including evaluating city employees and departments to ensure they were accountable and productive. In response, Davidson devised and implemented a reorganization plan that included the firing, in September 2015, of two popular longtime city employees.

¶7 Also early in her tenure in Moab, Davidson asked her assistant city manager (Assistant) to hire someone to assess the city's IT system and determine the extent of its cybersecurity issues. Davidson suggested that Assistant speak with Consultant, with whom she had worked in Kemmerer, and the city eventually hired Consultant. In May and June 2015, Consultant conducted a "security assessment" of the city's

computer system and determined that it was not sufficiently secure, and that significant work was required in order to secure it. Soon thereafter, Davidson, Assistant, and Moab's mayor (Mayor) met in an executive session with the Moab City Council and determined that, because of the "danger" presented by the IT system's vulnerability, there was "no time to present the work for competitive bidding," and concluded that the city should retain Consultant to perform the necessary work without following the usual competitive bidding process. Ultimately, the city agreed to pay Consultant more than $40,000 for this work. In late June 2015, shortly after the city hired Consultant, Smelt and Consultant formed a company called Tayo, Inc. (Tayo), which received the balance of the money owed to Consultant for the work he performed for the city. At the time, Davidson informed Mayor and the city attorney that Smelt lived at her house and was involved with Tayo, but did not at that time disclose those facts to the Moab City Council.

¶8　　A few months later, certain individuals—including each of the defendants in this case—began making public statements questioning the propriety of some of Davidson's actions in Moab. The first of these occurred in late October 2015, when an independent online newspaper known as The Canyon Country Zephyr (the Zephyr) published an article written by reporter (and defendant here) Jim Stiles, entitled "Upheaval at Moab City Hall: For its new City Manager, REBECCA DAVIDSON, 'It's DÉJÀ VU all OVER again.'" In this article, Stiles stated that "Moab/Grand County citizens" were upset by Davidson's decision to terminate two city employees as part of her restructuring plan. Stiles also stated that "upheaval . . . seems to be a pattern for Ms. Davidson. Wherever she goes, dissension and turmoil follow." Stiles then discussed Davidson's previous employment in Timnath and Kemmerer. With regard to Kemmerer, Stiles stated that Davidson had fired employees there in a manner similar to the two terminations in Moab, and that these firings had prompted several Kemmerer residents,

including McMillan, to speak out in opposition to Davidson. With regard to Timnath, Stiles reported that Davidson had clashed with public officials and had been suspended and eventually resigned from her position as part of a settlement. Stiles noted that "Timnath officials would not publicly discuss the matter," and quoted another news report on the subject as stating that "'both sides [of the Timnath settlement] signed a non-disparagement clause.'" Stiles concluded the article by stating that "[t]he Moab City Council must have been aware of Davidson's background at both Timnath and Kemmerer before they selected her" to be Moab's city manager, and that it must have "expected . . . that kind of baggage" when it made the decision to hire her.

¶9    According to an affidavit he submitted before the district court, Stiles based his assertions regarding Davidson's experience in Timnath on news reports and other sources. According to the news reports upon which Stiles relied, Davidson was employed by Timnath as its "town manager," a role which gave her some influence over construction and engineering projects occurring in the town. The reports also indicated that while serving as "town manager" Davidson simultaneously ran an engineering firm that was paid "hundreds of thousands of dollars a year" by Timnath. Those same reports indicate that during Davidson's tenure Timnath was sued twice regarding conduct that the complainants attributed at least in part to Davidson. Eventually, according to the same news sources, the town council began an investigation of Davidson's involvement with the town's "contracting processes," and suspended Davidson while the investigation was conducted. Ultimately, per the news reports, Timnath reached a settlement with Davidson in which she agreed to resign and each side agreed to sign non-disparagement agreements. The news reports quote Timnath town officials as stating publicly, after the settlement, that there was no evidence of "intentional wrongdoing" on Davidson's part.

¶10    Soon after the article was published, in November 2015, McMillan posted a comment on the Zephyr's online comments page, stating that "[t]he citizen[s] of Moab need to demand the removal of Rebecca Davidson as city administrator. What is happening will be just the beginning you have no idea what the person is capable of."

¶11    In February 2016, Stiles wrote a follow-up article for the Zephyr entitled "'What's Past is Prologue': Three Small Towns & Their Common Bond–City Manager Rebecca Davidson." In a preface, Stiles asserted that the article was based on information gathered from many sources, including government records he obtained from the City of Kemmerer, the Wyoming Division of Criminal Investigation, and the City of Moab, as well as interviews conducted with individuals who were aware of Davidson's activities in Timnath, Kemmerer, and Moab. In the article, among other things, Stiles discussed Davidson's termination of the two longtime Moab city employees, explored whether Davidson acted improperly with respect to Consultant's hiring, and examined Davidson's previous work for Timnath and Kemmerer, concluding that her previous employment had been "marked by heated controversy, angry public debate, and even litigation."

¶12    More specifically, in the article Stiles reported on the details of Davidson's departure from Timnath, and stated that "Davidson could not have been 'cleared' of anything" with respect to her actions in Timnath "because the non-disparagement agreement banned anyone involved in the litigation from expressing any opinion at all." While Stiles noted that a member of Moab city government had claimed an audit conducted by Timnath cleared Davidson of any wrongdoing, Stiles noted that he made a governmental records request for any such audit and was unable to even confirm its existence, let alone review a copy of it. Stiles also reported that "a priority for Davidson in Kemmerer was to dramatically 'restructure' its

government, a process that led to the departure of more than 20 of its employees in just three years," and that "Davidson . . . made criminal allegations against two of Kemmerer's staff, forcing an investigation," which, "in both cases, the county attorney declined to prosecute." He further stated that no competitive procurement process had been implemented in Moab with respect to Consultant's hiring or the eventual payment to Tayo, and that the City of Moab had "paid Tayo almost $30,000, four times the maximum allowed by the city" without conducting a competitive bid process.

¶13    Mayor publicly responded to Stiles's second article, which spurred Stiles to pen an op-ed piece in the Moab Sun News. In the op-ed, Stiles stated that his article "What's Past is Prologue" was the result of an "exhaustive, thoroughly researched investigation" into both Davidson's history and her performance as city manager of Moab. He reiterated his assertion that Davidson's employment in both Timnath and Kemmerer had been characterized by controversy, and opined that Moab was "watching history repeat itself."

¶14    Meanwhile, during this same time period, Chris Baird, a member of the Grand County Council, had also begun developing concerns about some of Davidson's actions. Baird first began expressing his concerns in posts to a Facebook group called "Citizens for Transparency in Local Government" that was geared towards Moab/Grand County residents. Eventually Baird crystallized those concerns in an op-ed written for the Moab Sun News that was published in June 2016. In that op-ed, Baird stated that in October 2015 he became aware of "a serious financial impropriety concerning the city's procurement of IT services." Baird went on to explain that Smelt lived with Davidson and registered Tayo "immediately prior to the city paying [Tayo] several thousand dollars . . . for IT services." This, Baird argued, presented "a clear conflict of interest" because Davidson and Smelt lived together when Smelt's company was

enriched by a city contract. Baird went on to state that "State law requires that such conflicts [of interest] be declared" through a formal process and that, "[as] far as I know, no such declaration was made." Baird also expressed that he felt "dismay" at Davidson's termination of city employees, and indicated he wanted to "see a greater level of accountability in finance" from the city government and for the city to "rethink their callous new management practices."

¶15 After publishing this op-ed, Baird made several additional postings to the "Citizens for Transparency in Local Government" Facebook group. In those posts, Baird defended his op-ed, and stated that he was concerned that the City of Moab had hired Smelt's company without Davidson properly disclosing her relationship with Smelt, which Baird opined was "in violation of all kinds of ethical laws." He also argued that Davidson's actions constituted a violation of legal or ethical standards governing her position. In addition to these online comments, Baird also made oral and written statements to members of the Moab City Council, and written statements to auditors investigating the situation, repeating his view that Davidson had violated legal or ethical standards.

¶16 Also, during the same time period, McMillan posted several online comments to stories on the "Citizens for Transparency in Local Government" Facebook page. In these comments, McMillan noted that she was a Kemmerer resident and stated that Davidson had "destroyed our community" and urged Moab's citizens to avoid letting Davidson "do to Moab what she did to Kemmerer." McMillan also referenced the events in Kemmerer concerning the suspected foreign cyberhacking that Consultant was paid to address, and compared those events to the cybersecurity issues Consultant identified and Tayo was paid for in Moab, stating that she "would question how almost the exact same situation [that] was reported in Kemmerer" could have presented itself again in Moab. She stated that she found it

"highly unlikely that a foreign threat would happen in both Kemmerer and Moab that resulted in the amount of money being spent by both communities to a company partially owned by" Smelt. McMillan also reiterated her belief that Davidson had been difficult to work with in Kemmerer, stating that "approximately 25 [city] employees left or were fired" during Davidson's tenure, and asserting in a separate post that "more than 28 employees left the city of Kemmerer" because of a hostile work environment during that period.

¶17   In June 2016, after the publication of Baird's op-ed, the city conducted an independent audit of "transactions and actions [from 2013 to 2016] involving engineering services, IT services[,] and other areas . . . to ensure that all those processes were performed correctly." The audit was completed by the end of June, and the auditor determined that "the City had followed its existing policies and procedures when it hired Tayo."

¶18   After he reviewed the auditor's findings, Baird sent a letter to the Mayor and to the Moab City Council indicating that he had "reviewed the independent audit findings" and had discussed further questions with the auditor, and that these new developments had prompted him to conclude that Davidson had not actually violated the letter of the law or of the City's ethics regulations. Nonetheless, Baird continued to express his displeasure with Davidson, stated that he and the auditor agreed that, "in princip[le]," Davidson's conduct should have been prohibited, and characterized Davidson as having taken advantage of a "loophole" to violate "the spirit of the laws and policies" governing her position. Baird advocated that the loophole be closed and that greater care be taken in future expenditures of public funds.

¶19   On September 13, 2016, the city placed Davidson on administrative leave for reasons not appearing in the record. However, around the time Davidson was placed on leave, the

city council held meetings that included an agenda item for discussion of a proposed ordinance that would heighten city employees' disclosure requirements regarding potential conflicts of interest pertaining to city transactions. On September 30, 2016, Davidson was terminated from her position as city manager for proffered reasons that do not appear in the record, but which Davidson contends were not related to the facts at issue here.

¶20 On September 16, 2016, three days after she was placed on administrative leave, Davidson initiated this lawsuit, accusing the Zephyr, Stiles, Baird and McMillan (Defendants) of defaming her and intentionally causing her to suffer emotional distress. Smelt and Tayo joined in the lawsuit,[2] with Smelt asserting that Defendants had defamed her and intentionally inflicted emotional distress upon her, and with both Smelt and Tayo claiming that the defendants intentionally interfered with their economic relations.

¶21 Defendants moved for judgment on the pleadings or, in the alternative, for summary judgment. Both sides attached affidavits to their memoranda, and the district court ended up considering those affidavits and deciding the motion pursuant to rule 56 of the Utah Rules of Civil Procedure. In their motion, Defendants argued that Davidson's and Smelt's defamation claims failed because Defendants' statements were either true or substantially true, were pure statements of opinion, or fell under the "public interest exception" protecting speech concerning governmental bodies, officials, and matters involving the expenditure of public funds. Specifically, Defendants asserted that Plaintiffs could not prevail on their defamation claims without proving "actual malice," which Defendants asserted required Plaintiffs to prove that Defendants had "published the

---

2. Davidson, Smelt, and Tayo are sometimes referred to herein as "Plaintiffs."

allegedly defamatory material with knowledge that it was false, or with reckless disregard for the truth." Defendants further argued that Plaintiffs' claims for intentional infliction of emotional distress and intentional interference with economic relations depended on a finding of defamation, and would fail if the defamation claims did.

¶22 Plaintiffs opposed Defendants' motion, with affidavits, but did not ask for additional discovery pursuant to rule 56(d) of the Utah Rules of Civil Procedure. After a hearing, the district court granted summary judgment to Defendants, agreeing that the allegedly defamatory statements were all either true or "in essence, true," were pure statements of opinion, or were protected under the "public interest privilege." The court further found that Plaintiffs had not presented evidence sufficient to demonstrate that Defendants acted with "actual malice," which the court identified as the standard of fault for a defamation claim under the facts of this case. The court also agreed with Defendants that the claim for intentional interference with economic relations depended on the success of their defamation claims, and failed because the defamation claims did. The court further determined that the claim for intentional infliction of emotional distress failed because Defendants' statements were not outrageous or intolerable as a matter of law.

ISSUES AND STANDARDS OF REVIEW

¶23 Plaintiffs appeal, and ask us to consider three issues. First, they contend that the district court erred when it determined that Defendants were entitled to summary judgment with respect to Plaintiffs' defamation claims. Second, Smelt and Tayo contend that the district court erred when it determined that Defendants were entitled to summary judgment on their claims for intentional interference with economic relations. Third, Davidson and Smelt contend that the district court erred when it

awarded summary judgment to Defendants with respect to their claims for intentional infliction of emotional distress.

¶24 "Summary judgment is appropriate where 'there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Gardiner v. Anderson*, 2018 UT App 167, ¶ 14 (quoting Utah R. Civ. P. 56(a)). "We review the district court's grant of summary judgment for correctness and accord no deference to its conclusions of law." *Id.* (quotation simplified). In addition, "we may affirm the result reached by the district court if it is sustainable on any legal ground or theory apparent on the record, even though that ground or theory was not identified by the lower court as the basis of its ruling." *Id.* (quotation simplified).

## ANALYSIS

### I. Defamation

¶25 Plaintiffs' central claim is that Defendants made defamatory statements about them, causing them to suffer damages. In order to succeed on their defamation claim, Plaintiffs must prove five separate elements: (1) that Defendants published the statements in question; (2) that the statements were false;[3] (3) that the statements were not subject to any

---

3. This element is often thought of as an affirmative defense upon which the defendant would bear the burden of proof. *See, e.g.*, *Brehany v. Nordstrom*, 812 P.2d 49, 57 (Utah 1991) (stating that "truth is an absolute defense to an action for defamation"). But where the plaintiff "is a public figure or the statement involves a matter of public concern," it is the plaintiff who "must shoulder the burden in his case-in-chief of proving the *falsity* of the challenged statement." *See Bustos v. A&E Television Networks*, 646 F.3d 762, 764 (10th Cir. 2011) (emphasis in original) (citing

(continued…)

privilege; (4) that the statements were published with the requisite degree of fault; and (5) that the statements resulted in damages. *See Jacob v. Bezzant*, 2009 UT 37, ¶ 21, 212 P.3d 535. Plaintiffs' claims here fail to satisfy the second and fourth elements, because some of Defendants' statements are either substantially true (on the record before us) or are pure statements of opinion which cannot, by definition, be proven false, and Plaintiffs have in any event failed to demonstrate that Defendants acted with the requisite degree of fault.

A.     The Allegedly Defamatory Statements

¶26     The first element that Plaintiffs must prove is that Defendants made the statements that Plaintiffs consider defamatory. In this case, there is no controversy about whether it was Defendants—as opposed to someone else—who published the statements in question. Indeed, Defendants concede in their brief that they "do not dispute either that the statements occurred or the specific content of the statements."

¶27     The difficulty presented by this first element is that Plaintiffs nowhere provide—not in their complaint, their summary judgment briefing below, or in their briefs on appeal— a comprehensive list of the statements they assert were defamatory. They certainly mention newspaper articles,

---

(…continued)

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986)). Davidson concedes that she is a public figure and, as we discuss below, we conclude that Smelt and Tayo are public figures for the purpose of assessing whether statements made about the public contract awarded to Consultant and Tayo are defamatory, and that all of the speech at issue here is therefore of public concern. Accordingly, in this case Plaintiffs bear the burden of proving that the statements they assail are false.

Facebook postings, and other statements in their briefs, but those articles and postings are lengthy and voluminous, and Plaintiffs acknowledge that not every statement contained in the identified posts and articles is alleged to be defamatory. In order to determine whether Defendants made actionable statements, we of course need to know what those statements are. When questioned about this at oral argument, Plaintiffs' counsel agreed that, if a particular statement was not specifically mentioned in Plaintiffs' opening brief, it was not intended to be among the statements Plaintiffs assert are actionable.[4]

¶28    After examination of Plaintiffs' brief, and as near as we can tell, it appears the following statements are the ones that Plaintiffs complain are defamatory:

Statements by McMillan:

- That the residents of Moab had "no idea" what Davidson was capable of;

- That Davidson "destroyed" Kemmerer, Wyoming;

- That Moab should not "let [Davidson] do to Moab what she did to Kemmerer";

---

4. While we have our doubts that this procedure is adequate, Defendants do not take issue with the manner in which Plaintiffs have set forth the specific statements upon which they rest their case, and therefore we choose not to ascribe dispositive effect to the somewhat cavalier manner in which Plaintiffs have identified the statements at issue. However, we emphasize that future defamation plaintiffs would be well-served by including in their complaints a list or other specific identification of the particular statements alleged to be tortious.

- That "approximately 25" or "more than 28" employees left the City of Kemmerer during Davidson's tenure;

- That "the exact same situation" involving a purported security breach resulting in a contract being awarded to Tayo occurred in Kemmerer prior to occurring in Moab, and that McMillan found it "highly unlikely that a foreign [cybersecurity] threat would happen in both Kemmerer and Moab that resulted in the amount of money being spent by both communities to a company partially owned by Tara Smelt."

Statements by Baird:

- That Davidson's suggestion of Consultant for Moab City's IT work, without what he viewed as proper disclosure, was a "serious financial impropriety" and presented a "clear conflict of interest" because the work done by Consultant ultimately enriched Tayo and Smelt;[5] and

---

5. In their brief, Plaintiffs assert that Baird stated that Assistant and Davidson had "violated the law and ethics rules by hiring Tayo, Inc. to perform IT services for [Moab]." Plaintiffs then argue that this statement was false because "Davidson did not hire Tayo, Inc. to perform IT services for the City." But the record does not support this characterization of Baird's statements. In fact, the portions of the record to which Plaintiffs refer demonstrate that Baird was aware that Davidson did not hire Tayo directly, and that the hire was made by Assistant for and on behalf of the City of Moab. Instead, Baird argued that Davidson's actions before the formation of Tayo enriched both

(continued…)

- That Davidson and Assistant violated legal and ethical rules by hiring Consultant.

Statements by Stiles and the Zephyr:

- That Davidson's actions as city administrator in Kemmerer "led to the departure of more than 20" Kemmerer employees "in just three years";

- That Davidson's experiences in city government in Timnath and Kemmerer were "marred by heated controversy, angry public debate, and litigation";

- That Davidson had not been definitively cleared of wrongdoing in Timnath;

- That Tayo was hired without participating in a competitive procurement process and received payments above and beyond what would normally be allowed by the city without that process; and

- That Moab was "watching history repeat itself" in reference to Davidson's actions in Timnath and Kemmerer.[6]

---

(…continued)
Tayo and, by extension, Davidson's housemate Smelt, without Davidson disclosing the "clear conflict of interest" that Baird believed this arrangement entailed.

6. Plaintiffs also allege that Stiles stated that Davidson, during her tenure as Kemmerer's City Administrator, "wrongfully terminated a large number of employees and made false

(continued…)

¶29 Thus, there are approximately a dozen specific statements that Plaintiffs assert were defamatory. For the reasons that follow, in our view each of those statements fails to satisfy at least one of the elements of a defamation claim. Our supreme court has noted that there are "countless ways [in which] the law [of defamation] defers to the commanding presence of free expression among our liberties." *See Jensen v. Sawyers*, 2005 UT 81, ¶ 89, 130 P.3d 325. Some of the statements at issue here are true or substantially true. Some are pure statements of opinion, which are not actionable in defamation. And none of the statements was published with the necessary degree of fault applicable here, given that the statements were made about a public official and about the expenditure of public funds.

B.    Truth, Falsity, and Opinion

¶30 The second element of any successful defamation claim is that the "statements were false." *See Jacob v. Bezzant*, 2009 UT 37, ¶ 21, 212 P.3d 535. Defendants assert that some of the statements at issue are in fact true—or at least there is no evidence on this record that they are not—or are statements of opinion that by definition cannot be proven false. We agree with Defendants.

---

(…continued)

allegations against employees who left their employment with that municipality." Plaintiffs do not cite to the record for this proposition, and in fact their characterization appears wholly unsupported. Although Stiles did indicate that Davidson terminated employees at Kemmerer and accused individuals of criminal activity, we are unable to locate any portion of Stiles's comments in which he alleges that the terminations were wrongful or that the accusations were false. Accordingly, we do not consider those claimed statements.

¶31 A plaintiff is definitionally unable to meet this requirement with regard to statements of pure opinion, because such statements "are incapable of being verified" and therefore "cannot serve as the basis for defamation liability." *See West v. Thomson Newspapers*, 872 P.2d 999, 1015 (Utah 1994). But "this protection is abused when the opinion states or implies facts that are false and defamatory." *Id.* (quotation simplified). Accordingly, in examining whether Plaintiffs have met their burden on this second element, we must determine whether any of the statements at issue here constitute protected expressions of opinion and, if so, whether any of those opinions state or imply underlying facts that might be considered defamatory. *See Spencer v. Glover*, 2017 UT App 69, ¶ 8, 397 P.3d 780.

¶32 Here, several of the statements Plaintiffs challenge are expressions of pure opinion that do not state or imply facts and are therefore not practically verifiable. *See West*, 872 P.2d at 1015. McMillan's statement that Davidson "destroyed" Kemmerer, Wyoming is a perfect example. No reader would take such a statement literally—clearly Kemmerer, Wyoming still exists, and has not been reduced to rubble by Davidson's actions. Such a statement is obviously intended to express McMillan's "subjective belief and amounts to rhetorical hyperbole." *See Spencer*, 2017 UT App 69, ¶ 12 (quotation simplified) (referring to a client's Yelp review that his lawyer was the "worst lawyer ever"); *see also Hogan v. Winder*, 762 F.3d 1096, 1108 (10th Cir. 2014) (applying Utah law, and stating that a "reasonable reader would realize not only that the accusation was made in the heat of a nasty employment dispute but also that the objectionable terms were merely hyperbole and rhetorical flourish").[7] As the

---

7. It might also be said that such statements, in addition to being protected statements of opinion, are not susceptible to a defamatory meaning. *See O'Connor v. Burningham*, 2007 UT 58, ¶ 26, 165 P.3d 1214 (engaging in a "context-driven assessment"

(continued…)

district court aptly noted, "[w]hether or not Ms. Davidson destroyed Kemmerer, Wyoming is clearly . . . a matter of opinion and not something we could ever try to determine its truth or falsity in this court."

¶33 Other statements fall into this same category, including McMillan's statements that Moab residents had "no idea what [Davidson] was capable of," and that they should not "let Davidson do to Moab what she did to Kemmerer," and Stiles's statement that Moab was "watching history repeat itself" with respect to Davidson's actions. Although we acknowledge that "opinions rarely stand alone, isolated from any factual moorings," and that "[a]ssertions of fact, being objectively verifiable and much more capable of harming reputation, are not entitled to the same degree of protection afforded expressions of opinion," *West*, 872 P.2d at 1015, Plaintiffs identify no specific assertions of fact, whether explicit or implicit, that these

---

(…continued)

of the alleged defamatory statement to determine whether the statement was "susceptib[le] to a defamatory interpretation"). Indeed, some of the statements to which Plaintiffs point were made in "op-ed" pieces in news publications, a forum that is a "traditional source of harsh political invective." *See West v. Thomson Newspapers*, 872 P.3d 999, 1009 (Utah 1994). "[C]riticism by newspaper columnists comes with the job of being" a public official, and "[w]hile statements about public figures in newspaper editorials are not incapable of being defamatory," such statements' presence in editorial form tends to "negate damage to [the public official's] reputation and therefore make[s] it less likely that the statement was defamatory." *Id.* at 1009–10. Because we have other grounds upon which to rest our conclusions, it is not necessary for us to reach the merits of whether the challenged statements were, in context, susceptible of a defamatory meaning.

particular statements invoke. These statements are pure statements of opinion that do not themselves state or imply specific facts, and Plaintiffs therefore cannot meet their burden of establishing that these statements are false.[8]

¶34    Moreover, some of the challenged statements, although not fairly characterized as statements of opinion, appear on this record to be true, or at least substantially true. *See Bustos v. A&E Television Networks*, 646 F.3d 762, 764 (10th Cir. 2011) (stating that "minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting of the libelous charge be justified" (quotation simplified)). For instance, McMillan's statements that "approximately 25" or "more than 28" employees left Kemmerer during Davidson's tenure appear to be at least substantially true. Plaintiffs concede that Davidson fired at least two employees during her time in Kemmerer, and that an unspecified number of other employees left Kemmerer's employ for various other reasons, including "seasonal employees" leaving "at various times." But Plaintiffs provide no other evidence that would help us nail down the exact number of employees who ceased working at Kemmerer during Davidson's time there. If, for instance, twenty-four employees left Kemmerer's employ during Davidson's tenure, such that McMillan's statement was only inaccurate by one employee, McMillan's statement would be at least substantially true, and therefore not actionable. *See id.* Similarly, Stiles's statement that Davidson's experience at

---

8. Some of the other statements—most notably Baird's expressed view that Davidson violated legal or ethical rules—are offered as opinions, but state or at least imply the existence of certain facts. With regard to those statements, the district court correctly entered judgment for Defendants, not because the statements were non-actionable expressions of pure opinion, but because—as discussed below—there is no evidence that Defendants had the requisite degree of fault in making those statements.

Timnath and Kemmerer was "marred by heated controversy [and] angry public debate" appears to be at least substantially true. It is undisputed that Davidson's actions in Timnath were the subject of some controversy, including media scrutiny. And the very existence of McMillan's Facebook postings more or less demonstrates that there was at least some contentious public debate about Davidson's actions in Kemmerer. Because Davidson has not produced any evidence to demonstrate whether, and if so by how far, these statements are false, such statements cannot be considered actionable here.

C.      Actual Malice and Fault

¶35    Thus, many of the statements to which Plaintiffs point cannot be defamatory because they are not false or cannot be shown to be false. Relatedly, however, even if we were to assume that there were a hint of falsity to at least some of Defendants' statements, Plaintiffs' defamation claims still fail, because Plaintiffs have not demonstrated that Defendants acted with the necessary degree of fault. As we discuss, because Davidson is a public official and the controversy in this case deals with the expenditure of public funds, Plaintiffs must prove more than merely the existence of false statements about them; they must demonstrate that Defendants acted with "actual malice" in making the statements in question. And on the record before us, Plaintiffs fall short of any such showing here.

¶36    Over the years, our country has developed "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *See New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). In the course of such robust debates on issues of public concern, it is inevitable that, on occasion, statements are made that are not completely accurate. *Id.* at 271 (stating that "erroneous

statement[s are] inevitable in free debate"). Such occasional false statements are part of the price we pay for an open democracy and "must be protected if the freedoms of expression are to have the breathing space that they need to survive." *Id.* at 271–72 (quotation simplified).

¶37    The level of protection that a statement receives, under principles of free speech and expression, depends upon the identity of the plaintiff alleging defamation. "A central maxim . . . in the realm of defamation law" is that "all persons are not treated equally." *O'Connor v. Burningham*, 2007 UT 58, ¶ 8, 165 P.3d 1214. Instead, "[t]hose who by choice or mishap acquire the status of a public official or public figure surrender a sizeable measure of their right to recover damages from those who defame them," in the form of facing a heavier burden to demonstrate that defamation occurred. *Id.* Indeed, "[t]he constitutional guarantees require . . . a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his [or her] official conduct unless he [or she] proves that the statement was made with 'actual malice.'" *Sullivan*, 376 U.S. at 279–80. Actual malice, as defined in this context, does not necessarily have anything to do with ill will or spite toward the person who is the subject of the statement; rather, an actor acts with "actual malice" if he makes a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 280.

¶38    In this case, all parties agree that Davidson is a public figure who must prove actual malice in order to succeed on her defamation claim. Plaintiffs maintain, however, that Tayo and Smelt are not public figures, and therefore that those two parties need not prove that Defendants acted with actual malice.[9] To

_____

9. We note that none of Defendants' statements which Plaintiffs challenge on appeal directly concern Smelt and Tayo, and only a

(continued…)

support this proposition, Defendants cite *Wayment v. Clear Channel Broadcasting, Inc.*, 2005 UT 25, 116 P.3d 271. In that case, an ex-employee of a local television station sued her former employer for public statements she believed her supervisor made about the reasons for her departure from the station. *Id.* ¶ 1. Her employer moved for summary judgment, arguing that she was a "public figure" for purposes of his statements and that she thus needed to meet a heavier burden of proof. *Id.* ¶ 13. The district court agreed and, applying that higher standard of proof, dismissed plaintiff's defamation suit. *Id.* ¶ 14. On appeal, our supreme court reversed and, in so doing, clarified the contours of who may or may not be defined as a "public figure" in the context of defamation.

¶39   First, our supreme court noted that there are two ways an individual can be considered a public figure with respect to allegedly defamatory statements. The first establishes an individual as "a public figure for all purposes and in all contexts" by virtue of their "'general fame or notoriety in the community[] and pervasive involvement in the affairs of society.'" *Id.* ¶¶ 24–25 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974)). The second is significantly narrower, establishing an individual as "a limited-purpose public figure." *Id.* ¶ 31. While all allegedly defamatory statements about an all-purpose public figure must be made with actual malice in order to be actionable, *id.* ¶¶ 19–22, statements about a "limited-purpose public figure" are subject to that heavier burden only if they are based on "a particular public controversy" in which the

---

(…continued)

few of those statements mention them even obliquely. For purposes of this opinion, however, we assume without deciding that Smelt and Tayo were ancillary subjects of Defendants' statements and that this sort of indirect reference could be sufficient to support a claim for defamation.

person "intentionally sought or obtained a position of influence," *id.* ¶ 32.

¶40 Here, Plaintiffs argue that Smelt and Tayo were not public figures because, although Tayo's retention by the city and Davidson's conduct as city manager were public controversies, neither Smelt nor Tayo intentionally sought or obtained a position of influence with respect to that controversy. "To the contrary," Plaintiffs argue, Smelt and Tayo are just "private parties who merely engaged in activities, which, as a result of the false statements by [Defendants], attracted public attention."

¶41 We disagree. While we acknowledge that neither Smelt nor Tayo appear to have participated in the public debate regarding the propriety of Davidson's actions, we note that Tayo received public funds pursuant to a city contract to perform IT work, and Smelt was Tayo's co-founder and co-owner. In other jurisdictions, courts have held that government contractors who receive government funds and then are involved in a controversy involving those contracts are public figures for the purposes of that controversy. *See Broussard v. Kaplan*, 604 So. 2d 77, 83–84 (La. Ct. App. 1992) (holding that an insurance agent who received a contract for a city's health insurance was a public figure with respect to a controversy surrounding how that contract was awarded); *Vandentoorn v. Bonner*, 342 N.W.2d 297, 300–01 (Mich. Ct. App. 1983) (holding that a plaintiff who owned and operated a towing and wrecking business and had a city contract was a public figure for the purpose of comments regarding his performance under that contract); *Gleichenhaus v. Carlyle*, 597 P.2d 611, 613 (Kan. 1979) (holding that a real estate agent who made a large campaign contribution to a city politician and subsequently received several appraisal contracts from the city without being subjected to a competitive bidding process was a limited-purpose public figure with respect to controversy surrounding both his contributions and the contracts he was awarded); *see also* Tracy A. Bateman, J.D., *Who*

*is "Public Figure" for Purposes of Defamation Action*, 19 A.L.R. 5th 1 § 106[a] (1994) (collecting cases in which public contractors were found to be public figures for the limited purpose of the details and scope of their contracts). We find the reasoning of these cases persuasive. Here, Tayo was paid public funds pursuant to a government contract that was awarded without a competitive bidding process, and at the time Smelt was a part-owner of Tayo and Davidson's housemate. Whether Tayo was properly a part of that government contract is unquestionably a matter of public concern. Accordingly, we are persuaded that Tayo and Smelt are limited-purpose public figures with respect to any controversy surrounding the process by which Consultant was awarded a government contract and Tayo received the funds associated with that contract,[10] and to the extent the district court's determination rested on that conclusion, it did not err.

¶42   Because all three Plaintiffs are public figures for the purposes of evaluating the statements in question, they each must establish not only that Defendants' statements were false but also that Defendants acted with "actual malice" in making the statements. *Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 22, 221 P.3d 205. To demonstrate actual malice, a plaintiff must present evidence that the speaker either knew the allegedly defamatory statement was untrue at the time it was made, or that the speaker acted at least "with reckless disregard" as to the statement's truth or falsity. *Id.* ¶ 30. The former can be demonstrated by presenting evidence that the defendant, at the time he made the statement, was aware of but ignored factual information contradicting the statement. *Id.* The latter, while "substantially subjective," can be shown by providing "sufficient

---

10. We note that Plaintiffs do not allege that any of Defendants' statements that involved Smelt and Tayo stemmed from anything other than the controversy regarding Consultant's retention (and Tayo's eventual payment) by Moab.

evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication," *id.* (quotation simplified), or that the statement was "so inherently improbable that only a reckless [individual] would have put [it] in circulation," *id.* (quotation simplified).

¶43    Here, Plaintiffs cannot point to sufficient evidence to meet that standard with regard to the statements they challenge. In their briefing, Plaintiffs spent significant energies attempting to demonstrate that Defendants acted with "ill will" or spite towards Davidson. Plaintiffs argue that Defendants "were angry and very upset" over Davidson's actions and that this anger demonstrates that Defendants acted with "malice." But Plaintiffs appear to confuse the legal term "actual malice," which can only be proved by demonstrating that Defendants knew their statements were false or acted with reckless disregard as to the statements' potential falsity, *id.*, with "common law malice," often used to "prove abuse of a conditional privilege," which can be proven in some circumstances by demonstrating "[i]ll will or spite," *id.* ¶ 47; *see also Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 904 (Utah 1992) (stating that "[a]ctual malice refers to the constitutionally mandated level of fault necessary for public figure cases," while "malice" refers to "simply a means of determining when" a privilege is forfeited).[11] For purposes of

---

11. It is unclear from the record whether the district court was applying constitutional malice requirements or the common-law public interest privilege in dismissing Plaintiffs' claims for lack of "malice." In Defendants' motion, they invoked the public interest privilege, but also stated that Plaintiffs could not prove defamation without proving "actual malice," which they defined as a showing that "the defendant published the alleged defamatory material with knowledge that it was false or with reckless disregard of whether it was false." Then, in its ruling, the district court likewise invoked the public interest privilege,

(continued…)

demonstrating actual malice, however, it does not matter whether Defendants disliked Plaintiffs. It only matters whether Defendants made statements they knew (or recklessly disregarded the possibility that they) were false.

¶44   On that subject, Plaintiffs offer virtually no evidence in support of their position. Although they characterize Defendants' statements as "obviously, objectively false" and "entirely baseless and unsupportable," the evidence supporting these characterizations is nearly nonexistent, and in our view

---

(…continued)

but also quoted the constitutional "actual malice" standard. At no point in the proceedings before the district court did Plaintiffs invoke rule 56(d) of the Utah Rules of Civil Procedure or make any request for additional discovery, even though Defendants had argued that part of the reason they believed summary judgment was appropriate was because they believed Plaintiffs had no evidence that Defendants knew (or recklessly disregarded evidence that) their statements were false. While we acknowledge some confusion with regard to the extent to which the district court rested its decision on the constitutional "actual malice" standard, it is in any event clear from the record that the issue was raised in Defendants' motion and that no request for additional discovery was made, and we may affirm the district court's decision on any ground apparent from the record. *See Gardiner v. Anderson*, 2018 UT App 167, ¶ 14 (stating that "we may affirm the result reached by the district court if it is sustainable on any legal ground or theory apparent on the record, even though that ground or theory was not identified by the lower court as the basis of its ruling" (quotation simplified)). In our view, it is apparent from the record that Plaintiffs have not produced evidence indicating that Defendants acted with the requisite level of fault (actual malice), and we therefore affirm largely on that basis.

insufficient as a matter of law to demonstrate that any of the Defendants acted with actual malice.

1.      Stiles's Statements

¶45    Contrary to Plaintiffs' contentions, none of Stiles's statements is obviously false. For instance, his statement about the number of employees who left Kemmerer during Davidson's tenure was carefully phrased; he stated that "[c]ritics of Davidson argue that more than 20 Kemmerer city employees left their jobs during her three years in Kemmerer," but noted that there is no "official count" of how many employees left, and that it is "impossible to confirm" the reasons for each individual employee's departure. Plaintiffs do not dispute that at least *some* employees left Kemmerer's employ during Davidson's tenure, but have not offered any evidence as to what the exact number was, or the reasons for the departures. More to the point, Plaintiffs have produced nothing that would indicate that Stiles knew that his description of these events was false, or that he recklessly disregarded the possibility that it might be. Similarly, even if Stiles's statement that Davidson's previous experiences in city government had been "marred by heated controversy, angry public debate, and litigation" is assumed to have some minor inaccuracies, *see supra* ¶ 34, Plaintiffs have not provided evidence to establish exactly what those inaccuracies are or, more importantly, that Stiles was aware of (or acted with reckless disregard toward) any inaccuracies.

¶46    Further, Plaintiffs also have not demonstrated that Stiles was off-base when he stated that Davidson had never been "cleared of wrongdoing" in Timnath. Although Stiles acknowledged that Davidson maintained she had been exonerated by an audit, he noted that—despite making a request for the audit—he had never received direct evidence that this was true, and further noted that, according to his sources, Davidson's claim was undermined by a non-disparagement

agreement banning Timnath officials from discussing the issue. Further, Stiles claimed to have drawn his version of the facts regarding Timnath from various sources, including other news reports which he attached to his affidavit. Plaintiffs have provided no evidence that the facts in those articles or Stiles's characterization of those facts was incorrect, or that he was otherwise aware of (or acted with reckless disregard toward) any inaccuracies in this account.

¶47    It is a similar story with regard to Stiles's statements that Tayo was hired without participating in a competitive procurement process and received payments over and above what would normally be allowed by the city without such a process. Plaintiffs characterize these statements by Stiles as allegations that "Davidson had violated the requirement for a competitive procurement process" when Tayo was hired. Plaintiffs then attempt to rebut these allegations by explaining that Consultant was retained (and Tayo eventually paid for Consultant's work) on an emergency basis by Davidson and Assistant. But the record does not support Plaintiffs' characterization of Stiles's statements. Instead, Stiles indicated— correctly—that no competitive procurement process was followed for the retention of Consultant, and that the eventual payout to Tayo exceeded the amount normally allowed without a competitive procurement process. Stiles did not explicitly assert that the requirement for a competitive procurement process was violated and, indeed, detailed the justification Plaintiffs now offer in the text of his article, albeit in a way that suggests he disagrees with Plaintiffs' reasoning. As with the other statements, Plaintiffs offer no evidence that Stiles made these statements with at least a reckless disregard for the possibility that they might be false.

¶48    Part of the reason the record is devoid of any such evidence is that Plaintiffs did not depose—or even request to depose—Stiles or anyone else associated with the Zephyr to

determine what they knew at the time they made the allegedly defamatory statements, as other successful defamation plaintiffs have done when bringing suit against news reporters. *See*, *e.g.*, *Harte-Hanks Comms., Inc. v. Connaughton*, 491 U.S. 657, 682–84 (1989) (permitting the question of actual malice to be submitted to the jury because the plaintiff established, partly through deposing the reporter who wrote the allegedly-defamatory story, that the reporter had deliberately chosen not to interview potential witnesses who might tell a different story than the one printed, and that therefore there was a question of fact as to whether the reporter recklessly published a false statement); *cf. Russell*, 842 P.2d at 899, 905 (allowing a plaintiff to proceed to trial on the question of "malice" because she presented evidence that the reporter wrongly attributed a quote to a person). As a result, other than Stiles's own assertions that he conducted an "exhaustive, thoroughly researched investigation" involving numerous public records requests and interviews, the record contains no indication about the level of diligence Stiles achieved while researching the facts underlying his articles. There is no evidence, on this record, that there exist sources that Stiles should have consulted but did not, or individuals Stiles should have interviewed but did not. *See Connaughton*, 491 U.S. at 682–84. There is certainly no indication that Stiles recklessly failed to complete basic research into his stories for the purpose of publishing a deliberately one-sided article.

2.      Baird's Statements

¶49      Plaintiffs have similarly failed to provide evidence that Baird knew, or recklessly disregarded the possibility, that any of his statements were false. The chief statement attributed to Baird with which Plaintiffs take issue is Baird's viewpoint, expressed publicly in various ways, that Davidson violated legal or ethical rules by suggesting that the city hire Consultant (and Tayo) but not appropriately disclosing her relationship with Smelt and Smelt's involvement with Tayo. Plaintiffs correctly point out that

an independent auditor, after a comprehensive review, concluded that Davidson violated neither laws nor city ordinances or policies. But Plaintiffs' arguments with regard to Baird are nevertheless unpersuasive.

¶50 First, Plaintiffs point to no evidence, in this record, that any of the facts supporting Baird's publicly-expressed opinions were wrong. *See West v. Thomson Newspapers*, 872 P.2d 999, 1015 (Utah 1994) (stating that statements of pure opinion cannot be defamatory because they "are incapable of being verified," but that "this protection is abused when the opinion states or implies facts that are false and defamatory"). Baird based his views on the undisputed facts that (a) an "emergency purchase" was made, in the absence of a competitive bidding process, to a company Smelt partially owned while she was living with Davidson, and (b) Davidson did not formally disclose her relationship with Smelt to the city council prior to the city making payments to Tayo. On this record, there is no indication that these factual assumptions were in any way inaccurate.

¶51 Second, although Baird may have misapprehended the legal consequences of Davidson's actions under the rules applicable at the time, there is no indication on this record that Baird was aware (or recklessly disregarded the possibility) that his viewpoint was incorrect. A statement made with a good-faith belief in its accuracy is not a statement made with actual malice. *See, e.g.*, *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) (stating that a statement about "a public official" that "was indeed made in good faith" is not actionable in defamation, even if it is ultimately found to be untrue); *see also Marcone v. Penthouse Intern. Magazine for Men*, 754 F.2d 1072 (3d Cir. 1985) (holding that the publisher did not act with "actual malice" when it falsely indicated that an attorney had been convicted of drug charges, because the publisher was not on notice as to the statement's probable falsity); *Libel and Slander: Privilege as to Statement Reflecting on Manner in Which Public Work is Performed*,

50 A.L.R. 339 § IV (2018) ("The privilege of a statement reflecting on the manner in which public work is performed has been held not to depend on reasonable grounds for believing it to be true, but only on good faith and honest belief that it was true."). In this case, there is no evidence that Baird held anything other than a good-faith belief in the merits of his position. He indicated in his op-ed that he had discussed his concerns with a number of city officials and conducted research calculated to get to the truth of his claims. As with Stiles, Plaintiffs did not seek to depose Baird, and thus have no evidence that Baird failed to fully research his position before making the statements.[12]

¶52     Moreover, each of Baird's public assertions that Davidson violated legal or ethical rules *preceded* the release of the auditor's contrary conclusion, and there is no indication that Baird was aware of the auditor's conclusion before he made any of the statements at issue here. Indeed, after he reviewed the results of the audit, Baird did not continue to publicly maintain that Davidson had violated the law or existing ethics provisions. While Baird did express displeasure with Davidson even after reviewing the audit results, his focus after that point appeared to change from maintaining that she violated the rules to acknowledging that the rules contained a "loophole" of which he believed Davidson had taken advantage, a conviction he apparently shared with the auditors themselves.

---

12. While Plaintiffs claimed at oral argument that Baird knew that Davidson had not engaged in any impropriety because he had been made aware at a "council meeting" that Davidson had disclosed her relationship with Smelt, the record does not support that assertion. In fact, the council meeting to which Plaintiffs refer appears to have been the meeting at which the auditor's findings were presented, which occurred *after* Baird published the statements plaintiffs characterize as defamatory.

3.      McMillan's Statements

¶53     Finally, there is no indication on the record before us that McMillan made any of her statements with actual malice. As noted above, most of McMillan's postings were statements of pure opinion that are intended to be understood hyperbolically and which cannot be proven false. To the extent some of McMillan's statements—for instance, her statement that "approximately 25" or "more than 28" employees left Kemmerer's employ during Davidson's tenure at least in part because of Davidson—are grounded in fact rather than expressions of pure opinion, Plaintiffs have not produced evidence that McMillan knew her statements were false, or spoke while recklessly disregarding the possibility that they might have been. As noted above, it is undisputed that some number of employees left Kemmerer during Davidson's time there, but there is no indication of how many or why they left, and certainly no indication that McMillan knew she had her facts wrong when she made the statements at issue.

¶54     For all of these reasons, Plaintiffs have failed to demonstrate that Defendants acted with actual malice with respect to any of their statements, and accordingly have not presented evidence sufficient to establish the requisite degree of fault to support their defamation claim. Accordingly, the district court did not err when it awarded summary judgment in favor of Defendants on that claim.

## II. Intentional Interference with Economic Relations

¶55     Because the district court did not err in granting summary judgment to Defendants with regard to Plaintiffs' defamation claims, the court also did not err in granting summary judgment to Defendants on Smelt's and Tayo's claim for intentional interference with economic relations. "In order to win a tortious interference claim under Utah law, a plaintiff must . . . prove (1) that the defendant intentionally interfered with the plaintiff's

existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff." *Eldridge v. Johndrow*, 2015 UT 21, ¶ 70, 345 P.3d 553 (quotation simplified). Here the only "improper means" Tayo and Smelt allege are Defendants' purportedly defamatory statements. Because Tayo and Smelt have not presented sufficient evidence to sustain their claims for defamation, it follows that they also have not presented sufficient evidence to prove the "improper means" element for intentional interference with economic relations. Accordingly, the district court did not err in awarding summary judgment to Defendants with respect to Tayo's and Smelt's claim for intentional interference with economic relations.

### III. Intentional Infliction of Emotional Distress

¶56    Finally, Plaintiffs allege that the district court erred when it awarded summary judgment to Defendants on Davidson's and Smelt's claims for intentional infliction of emotional distress. To sustain a claim for intentional infliction of emotional distress, a plaintiff must demonstrate: "(a) that [a] defendant intentionally engaged in some conduct toward the plaintiff considered outrageous and intolerable in that it offends the generally accepted standards of decency and morality"; "(b) with the purpose of inflicting emotional distress or where any reasonable person would have known that such would result;" and "(c) that severe emotional distress resulted as a direct [consequence] of the defendant's conduct." *Ellison v. Stam*, 2006 UT App 150, ¶ 34 n.5, 136 P.3d 1242. But "[a]n act is not necessarily outrageous merely because it is tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it is illegal." *Franco v. The Church of Jesus Christ of Latter-Day Saints*, 2001 UT 25, ¶ 28, 21 P.3d 198. Rather, to sustain a claim for intentional infliction of emotional distress, a defendant's alleged conduct "must be more than unreasonable, unkind, or unfair," it must instead be so severe as to "evoke outrage or revulsion." *Cabaness v. Thomas*, 2010 UT 23, ¶ 38, 232 P.3d 486, *abrogated on other*

*grounds by Gregory & Swapp, PLLC v. Kranendonk*, 2018 UT 36, ¶¶ 29–32, 424 P.3d 897.

¶57 Although "the tort of intentional infliction of emotional distress is not . . . subsumed within a defamation claim" in the same way a claim for tortious interference is when the alleged improper means is defamation, "where an emotional distress claim is based on the same facts as a claim for defamation, appropriate concern for the First Amendment rights of the parties must be considered." *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 905–06 (Utah 1992) (quotation simplified). In that situation, "[a] plaintiff may not recover for the tort of emotional distress by reason of a defamatory publication absent a showing of the requisite level of fault." *Id.* at 906.

¶58 For two reasons, then, Davidson's and Smelt's claim for intentional infliction of emotional distress fails. First, for the reasons set forth above, Davidson and Smelt have not demonstrated the requisite level of fault with regard to any of the statements they claim are defamatory. *See supra* ¶¶ 35–54. Accordingly, they may not state a claim for intentional infliction of emotional distress with regard to those same statements.

¶59 Second, the statements identified by Davidson and Smelt do not constitute behavior so extreme as to evoke outrage or revulsion or offend generally accepted standards of decency and morality. Here, Davidson and Smelt allege that Defendants "sought to and in fact did publicly impeach the integrity of both Ms. Smelt and Ms. Davidson in their professions" by making "public, false accusations about Ms. Davidson and Ms. Smelt that, ordinarily, are reserved for people who have been convicted of money laundering or other, similar criminal offenses." Even assuming that this characterization is accurate, the described conduct is not outrageous or intolerable enough to offend generally accepted standards of decency and morality. *See Franco*, 2001 UT 25, ¶ 28 (noting that "[t]o be considered

outrageous, the conduct must evoke outrage or revulsion; it must be more than unreasonable, unkind, or unfair," and that "an act is not necessarily outrageous merely because it is tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it is illegal" (quotation simplified)); *see also Bodett v. CoxCom, Inc.*, 366 F.3d 736, 747 (9th Cir. 2004) (noting that "false accusations alone" are typically "not enough to constitute an intentional infliction of emotional distress"). Davidson and Smelt are, in effect, seeking redress against Defendants for critical political speech. While it is evident that the comments were critical, and perhaps even hurtful for them to endure, such speech, without more, is insufficient to constitute intentional infliction of emotional distress. Accordingly, the district court did not err when it granted summary judgment to Defendants on Davidson's and Smelt's claims for intentional infliction of emotional distress.

## CONCLUSION

¶60   Public officials in American society are subject to being criticized, even sharply and potentially falsely, about matters of public concern. The criticism leveled in this case against Plaintiffs regarding Davidson's performance as Moab City Manager, and regarding a public contract awarded to Consultant and Tayo for IT work, concerned public matters about which citizens have the right to express their views. In order for statements about such matters to be defamatory, they must be both false and made with actual malice. Some of the statements at issue here are not false, and there is no evidence, on this record, that any of the statements were made with actual malice. Accordingly, the district court did not err in granting summary judgment to Defendants with respect to any of Plaintiffs' claims.

¶61   Affirmed.

_____